[No. 36806.    Department Two.    May 21, 1964.]

THE STATE OF WASHINGTON, *Respondent,* v. MARY LOUISE INGLE, *Appellant.**

*Reported in 392 P. (2d) 442.

*Irving C. Paul, Jr.,* for appellant.

*Charles O. Carroll* and *William L. Kinzel,* for respondent.

OTT, C. J.—May 15, 1962, at approximately 10 a.m., Mary Louise Ingle went to Trudy's Tavern in King County, where she met her friend Kay Guis, and engaged in drinking beer until noon. Thereafter, they drove to the Derby Tavern and resumed drinking beer. Shortly after noon, they were joined at the bar by Forrest L. Vertz and Herbert Tubb, whom they had met at Trudy's Tavern that morning. The four drank beer together until approximately 4 p.m., when Mrs. Ingle and Forrest Vertz left the tavern, with a six-pack of beer, and drove away in Mr. Vertz' green Chevrolet pickup truck.

At approximately 4:30 p.m., Larry Druxman noticed that the green Chevrolet pickup truck was being driven in a weaving manner from one side of the road to the other, as he followed behind it in his Volkswagen. When he attempted to pass, he noticed that a woman was driving, whom he later identified to be Mary Louise Ingle. She accelerated the truck and swerved onto the right-hand shoulder of the highway, striking and instantly killing Michael J. Cummings, and Wade C. Mussulman, who were walking on the shoulder of the road.

Mr. Druxman followed the truck and wrote down the license number. He thereafter lost sight of the vehicle when it turned off the main highway.

Miss Leola Heath, who was driving her automobile several car lengths behind the death truck, saw it strike the guard rail at a high rate of speed, bound away from the rail, and proceed down the highway. She stopped her automobile beside the bodies of the dead youths.

Shortly after the killing, Mrs. Marian Platt and Donald L. Ross noticed the weaving manner in which the green Chevrolet truck was being driven, as it approached them from the opposite direction, and that a woman was driving.

Mrs. Millie Neisinger also observed the erratic driving, and identified Mrs. Ingle as the driver of the truck.

Approximately 4½ miles from the scene of the accident, Thomas Bunnell, an attendant at the Davis Mobil Service Station, saw Mrs. Ingle drive onto the service station grounds and, as he approached the passenger side of the truck, the man passenger said: " 'Call the cops, we just hit two kids up on the highway.' " Mr. Bunnell called as requested. He testified that both Mrs. Ingle and the passenger were intoxicated; that the radiator of the truck had been damaged, and that the right front fender was bent back so that the passenger could not open the door.

Mrs. Ingle and Mr. Vertz were arrested and taken to a State Patrol station. Mrs. Ingle's Breathalyzer test recorded .15 plus "percent of blood alcohol by weight."

Mary Louise Ingle was charged in two counts with the crime of negligent homicide, committed while operating a motor vehicle in a reckless manner and under the influence of or affected by the use of intoxicating liquor, (1) for the killing of Michael J. Cummings, aged 16, and (2) for the killing of Wade C. Mussulman, aged 16. She was charged in count 3 with failing to stop and render assistance, and in count 4 with operating a motor vehicle while intoxicated.

Forrest L. Vertz was charged with aiding and abetting Mary Louise Ingle in the commission of the offenses charged.

At the trial of Mrs. Ingle (the defendants were tried separately), the state's evidence was substantially as above outlined. In his opening statement to the jury, her attorney said: " . . . our defense is that Mary Louise Ingle was not driving that car at the time of the accident."

Although two defense witnesses testified that Mr. Vertz was driving the truck as they left the Derby Tavern, the defense offered no evidence relative to the person who was driving the truck at the time of the killing. The scene of the killing was some four tenths of a mile from the tavern. Mrs. Ingle testified, but she did not refute the testimony of Larry Druxman or that of any other witness for the state who identified her as the driver of the death truck.

From the judgment and sentence entered upon the verdict of guilty, Mrs. Ingle has appealed.

Milton G. Heiman, her trial counsel, died subsequent to the trial of the cause, and the appeal has been perfected by her present attorney.

Appellant asserts that she was prejudicially limited by the trial court in the cross-examination of several witnesses. In this regard, the record discloses that the rulings of the trial court were predicated upon a series of repetitive questions propounded by the then counsel for appellant, and by misstatements of the evidence upon which inquiry was being made.

■ Limitation of the scope of cross-examination of witnesses in the orderly trial of criminal cases is within the discretion of the trial court. Its determination in this regard will not be disturbed, in the absence of a showing of a manifest abuse of discretion. *State v. Robinson,* 61 Wn. (2d) 107, 109, 377 P. (2d) 248 (1962), and cases cited.

■ At the trial, counsel for appellant made no offer of proof relative to any matters he expected to establish by further cross-examination; nor did he indicate in what manner his client's cause was prejudiced by the alleged limitation.

This assignment of error is without merit.

Appellant contends that the trial court, in its rulings on objections, and in colloquies with counsel, did "impair the influence and destroy the usefulness of counsel so as to infringe appellant's right to due process of law."

After the jury had been selected, the court, in its general instructions, said in part:

"Now, I don't think I told all of you, but it will bear repeating, the case is really divided into two areas; one, are questions of fact, and others are questions of law. On the questions of fact, you gentlemen are the sole determiners. I have nothing to do with questions of fact. That is entirely up to you.

"If at any time I indicate in any way, one way or the other, on a question of fact, you are to disregard totally

anything I say. I have nothing to do with it. That is your sphere. . . .

" . . .

"From time to time I anticipate, and it generally occurs, there may be colloquy between counsel and the Court, and sometimes between counsel and counsel. If there is, somebody is going to be hurt, but that colloquy you are to disregard. That is colloquy between the three of us, or two of us, and has nothing to do with the facts or the evidence or the law. That is between us and you are to disregard it. I know you will hear it, but that is not part of the evidence."

One instance of alleged misconduct relied upon by appellant occurred as follows: Miss Leola Heath, an airplane stewardess, testified that she witnessed the accident on the day in question, and that she tried to follow the green truck. In this regard, she said:

"Q. (By Mr. Hoff) Just tell us, if you would, Miss Heath, what you saw. A. Well, I saw a pickup truck drive off the highway, hit the railing, follow the railing for some distance, and then back onto the highway, and then departed at a high rate of speed. Q. Did you see this pickup strike anything other than the railing? A. No. Q. Which way were you traveling with relation to the pickup? Were you going the same way, or the other way? A. I was going the same way. Q. How far were you behind or ahead of it? A. I was the third car behind the pickup. Q. In what lane of traffic were you traveling? A. The outside lane. Q. Is that the one nearest the shoulder or nearest the center? A. Nearest the shoulder. Q. What lane was the pickup traveling in? A. The same lane. . . . Q. Did you see any pedestrians on the highway? A. No, not before that. Q. Did you see who was driving the pickup? A. No. Q. Do you recall what color this pickup was? A. Yes, it was green. Q. Do you know what kind? A. Not at that time I didn't, no. Q. Did you see—then what happened after the pickup pulled back onto the roadway? A. What happened? Q. Yes. What did you do then, or what did you see? What did you do? MR. HEIMAN: Pardon me. May the record show, your Honor, that the Deputy Prosecutor is asking questions with a paper in his hand. I don't know what the paper is. THE COURT: All right, let the record show it. MR. HEIMAN: Thank you. Q. (By Mr. Hoff) Would you just tell us what you saw or did then? A. Well, I stopped. Q. Where did you stop? A. I stopped right there by the one body. It was

right in front of my car. Q. A body was in front of your car? A. Yes. Q. Had you noticed this before the time you stopped? A. No. Q. You didn't see who had struck this body? . . . A. (By the witness) I didn't see who struck the body, no. Q. (By Mr. Hoff) Then after you stopped, what did you do? A. After I was stopped, I was just sitting there and a party from across the highway ran across to me and said, 'Go after them.' Q. What did you do then? A. So I proceeded down the highway. Q. At that time did you have this pickup in sight? A. Yes. Q. What did you do then? Did you follow it? A. Yes. Q. How far did you follow it? A. I followed it to the intersection there at the bottom of the Duwamish Hill. Q. Did you have the pickup in sight at all times? A. No. Q. When did you lose sight of the pickup, and why? A. Well, there was one particular instance. There was this curve in the road, and I was some distance behind, so I lost sight at that particular time. Q. Were there any other times? A. I don't remember."

On cross-examination, she testified:

"Q. Then as soon as you were told to follow that pickup truck, you did your best in following it, right? A. Yes. Q. In fact, you had to increase your speed to catch up with it because it was ahead of you? Right? A. Yes. . . . Q. What did you do when they turned right? Where did you go? A. I turned around and went back to the scene of the accident. Q. Actually, that was a dangerous thing to do, wasn't it? I mean, ordinarily you wouldn't do that in this section here? A. No. Q. Because you might get arrested for an illegal turn, isn't that correct? A. That is correct. Q. But you could explain you were following a pickup truck? A. Yes. Q. You weren't worried about being arrested? MR. HOFF: I will object to this, your Honor. MR. HEIMAN: I think it is quite essential. Thank you. The Court's indulgence for just one second. . . . Q. . . . Now, you made a statement to the officer right after you came back, isn't that right? Did you at the scene of the accident make a statement to the officer? A. Yes. Q. He was a State Patrolman? A. Yes. Q. Did you notice his rank? Could he possibly be a Captain of the State Patrol? A. I am not sure. Q. Do you remember—you testified that you saw part of the accident; is that right? Did you just testify that the only thing you saw, I believe, is that the pickup truck hit the rail? Is that right? Isn't that what you testified to? A. Well, yes. Q. If you don't remember,

Miss Heath—I denoted the word, 'Well, yes.' If that means 'I don't remember,' I don't want you to say something that is not true, and I am sure as an intelligent woman you wouldn't want to say anything that isn't true. Now, did you or did you not, and if you don't remember, then that is all right, too. THE COURT: Did she or did she not what? MR. HEIMAN: That is a good question. What is the question, Mr. Reporter, if I may have it? (Whereupon, the question was read by the reporter.) Q. (By Mr. Heiman) Did you hear the question? A. Yes. Q. Is that true, when this gentleman over here, Mr. Hoff—THE COURT: Just ask a question and don't worry about counsel. You are confusing the issue, Mr. Heiman, and she can't answer four questions at once. Ask one question at a time. MR. HEIMAN: I am sorry, your Honor. I will have to ask the jury to be excused. THE COURT: The jury will not be excused. Propound a question. You can take up any matter at recess time. MR. HEIMAN: There is a statement made by the Court, your Honor, that I am sorry I object to. THE COURT: You may object to it, and you may make a proper motion at a proper time."

In the absence of the jury, counsel moved for a mistrial because of the limitation of cross-examination, and the court's comments. The motion was denied.

Again, during the redirect examination of Donald L. Ross, Mr. Heiman had objected several times to an alleged analogy by the witness, and was sustained. Thereafter, the following occurred:

"MR. HEIMAN: Just a moment, your Honor. I am going to object to an analogy. THE COURT: All right, sit down. I am sustaining your objection. MR. HEIMAN: You don't mind my getting up to object to you, do you, sir? THE COURT: No, but when you are through I would like to have you sit down. MR. HEIMAN: Yes, sir."

Finally, during the trial and in the presence of the jury, Mr. Heiman asked the court to keep a record of the time used in direct examination and in cross-examination. After the witness Ross was excused, the court said:

"THE COURT: Let the record show that there was 45 minutes of cross-examination. MR. HEIMAN: Now, your Honor— THE COURT: That is what you asked for, Mr. Heiman. You wanted the record to show. MR. HEIMAN:

Why wasn't it shown prior to this time, sir, when I didn't cross-examine any witnesses, two and three in a row? I think that is prejudicial, sir. THE COURT: It is not prejudicial. You asked that a record be made, and I am making the record. The direct examination was 10 minutes."

We have considered the other instances of alleged misconduct and find they are comprised of statements made when the jury was not present, and others to which appellant's counsel indicated no objection whatever.

At the close of all the evidence, the court instructed the jury as follows:

Instruction No. 16: "Under the Constitution and laws of this State, the Court is prohibited from commenting upon the facts in this case or upon the credibility of any witness who has testified before you. The court has not intentionally commented upon the facts in this case or upon the credibility of any witness who has testified before you, but if it has seemed to you that during the course of the trial, or in the giving of these instructions, the Court has said or done anything that would appear to be commenting upon the facts or upon the credibility of any witness, it is your duty to entirely disregard the same, and determine the facts solely from the evidence that has been admitted in the case."

Appellant employed an attorney of her choice. Her attorney had had more than 28 years of practice in this state. He vigorously defended his client's interest at all stages of the proceeding. The trial of this case commenced September 13, 1962, and concluded September 20th. There were six full days of trial and two evening sessions. The statement of facts, exclusive of the voir dire examination of the jury, consists of 816 typewritten pages. Thirty witnesses testified, and 15 exhibits were admitted in evidence.

A meticulous examination of the record establishes that, studiously and continuously, appellant's counsel antagonized the court, in its attempt to maintain decorum, respect, and dignity, by biting remarks, misquoting the court and the evidence, repititious questions, disregard of the court's rulings, and argument after rulings. Several times, in the absence of the jury, counsel was warned by the court as to his conduct. Many times during the trial, counsel for

appellant thanked the court for its patience and restraint, and apologized for his own conduct.

Some of the court's above-quoted statements, directed to counsel and made in the presence of the jury, do not show proper restraint and should not have been made. Did they so prejudice the appellant's cause as to have denied her a fair trial? We think not.

A trial of more than 6 days' duration could hardly be said to be free of error. The constitution guarantees a fair trial, not a perfect trial. *United States ex rel. Weber v. Ragen*, 176 F. (2d) 579, 586 (1949). The statements objected to were colloquies between the court and counsel. The court, on three separate occasions, especially instructed the jury to disregard colloquies. The colloquies can be said to be prejudicial only if we hold, as a matter of law, that juries do not follow the court's instructions. We have consistently held that juries are presumed to follow the court's instructions. *State v. Costello,* 59 Wn. (2d) 325, 332, 367 P. (2d) 816 (1962), and case cited; *State v. Kelsey,* 46 Wn. (2d) 617, 625, 283 P. (2d) 982 (1955), and case cited.

Counsel for appellant stated: " . . . our defense is that Mary Louise Ingle was not driving that car at the time of the accident." On that issue, the appellant offered no proof to contradict the positive evidence offered by the state that she was in fact driving the truck at the time of the killing. We are convinced, in this regard, that the jury returned its verdict of guilty because all of the jurors believed the state's witnesses who testified that Mary Louise Ingle was driving the death vehicle at the time in question; that the colloquies between court and counsel in more than 6 days of trial were disregarded by the jury as instructed, and that the colloquies did not prejudice the appellant.

Finally, appellant contends that the court erred in admitting in evidence exhibit No. 21. The exhibit is a written statement signed by Forrest Vertz, given to Officer Erickson at approximately 6:30 p.m., on the day of his arrest, in which he stated that Mary Louise Ingle was driving the truck at the time it struck and killed the two young men.

Appellant called Forrest Vertz as a defense witness. During his examination, the appellant presented and caused to be admitted exhibit No. 20, which was a copy of the information charging Mr. Vertz with the crime of aiding and abetting Mrs. Ingle in the offenses charged. Thereafter, counsel for appellant questioned Mr. Vertz as follows:

"Q. (By Mr. Heiman) . . . Did you make a statement—you said you made a statement, is that right, sir? A. Yes, sir. Q. Who did you make the statement to? A. State Patrolman Erickson. Q. Erickson? A. Yes. . . . Q. . . . . Mr. Vertz, have you any interest in the outcome of the case that is on trial right now against Mary Louise Ingle? Have you any interest? A. By what do you mean? Q. Have you any personal interest in whether Mary Louise Ingle is found guilty or not guilty of this offense that she is charged with? . . . THE WITNESS: . . . Do you mean personal interest? Q. (By Mr. Heiman) Yes, personal interest, family interest, you personally. A. No, sir. Q. You have no interest in the outcome of this case, is that your answer? A. Yes, sir."

On cross-examination, Mr. Vertz testified:

"Q. (By Mr. Hoff) You testified, Mr. Vertz, that you made a statement to Officer Erickson of the Washington State Patrol, is that correct? A. Yes, sir. THE CLERK: State's Exhibit Number 21 for identification. (Whereupon, a statement was marked State's Exhibit Number 21 for identification.) Q. (By Mr. Hoff) I will hand you what has been marked for identification as State's Exhibit 21. Would you examine that, please? Do you recognize it? A. Yes, sir. Q. What is it? A. It is the statement that I signed. Q. Is that to Officer Erickson? A. Yes, sir. Q. Is this in your handwriting? A. No, sir. Q. Is that in the officer's handwriting? A. Yes, sir. Q. Thank you. MR. HOFF: I will offer State's Exhibit 21. MR. HEIMAN: May I see it? MR. HOFF: Yes, Mr. Heiman. MR. HEIMAN: Thank you, Counsel. Object to the statement, your Honor, in behalf of the defendant on the question of materiality. This is coming in through the back door, in my opinion, sir. This statement, I am sure, could have been introduced if the State of Washington, the Prosecutor's Office had this statement. If it is damaging or otherwise to my client, they could have introduced it as their witness. They chose not to call Forrest L. Vertz, and now they are coming in through

the back door. I think this covers the entire incident and I did not, fortunately, go any further than the door of the tavern as to when they left. I did not discuss who got into what seat, where they got into, or what happened afterwards. There was no testimony on that, fortunately."

The court ruled:

"Well, Mr. Paul, unfortunately Mr. Heiman opened the subject up. If there was no purpose in asking about the statement, he had no business asking about it. In other words, now the implication is to the jury that there is a statement and he wants to imply one thing, and I think the State has a right to show what the statement is."

After the statement was admitted, Mr. Heiman questioned relative to it as follows:

"Q. Now, Mr. Vertz, now that the statement has been read to the jury, which is a different status than prior to that time, I now ask you, have you any personal interest in the outcome of this case of Mary Louise Ingle? A. No, sir. Q. You have not? A. No, sir. Q. Although you accused her of driving that car? A. I accused her? Q. Yes; you did. A. I stated a fact. . . . Q. (By Heiman) Sir, didn't you realize when you signed this statement that either you as owner of the car, or Mary Louise Ingle, would be charged with some offense? . . . A. I realized someone would be charged, yes, sir. Q. (By Mr. Heiman) Were you one of the someones? A. I didn't think I would be charged, no. . . . Q. (By Mr. Heiman) Who were the someones that you had in mind? A. The someone was Mary Louise Ingle. Q. And who else? A. No one else. . . . Q. What time was the accident? Have you any idea? A. All I know is what I have heard here. I know the approximate time. . . . Q. (By Mr. Heiman) What was the approximate time, sir? A. Around 4:30. Q. When the accident happened? A. Around 4:30. Q. What is the time that State's Exhibit 21 was taken? Do you know, sir? Do you know of your own knowledge? A. I just read it. Q. Do you know from your own knowledge, sir? A. No, sir. Q. All right. Do you wish to refresh your memory from that? A. Yes. 6:40 p. m."

The appellant inquired relative to the witness' having given a written statement. The witness answered that he had given a signed statement to Officer Erickson. Appellant's counsel knew of the statement, had read it prior to

trial, and was not taken by surprise by the testimony of the witness. Appellant's attorney did not elect to introduce the statement after he had elicited an admission from the witness that he had given it. From this testimony, the jury could have inferred that Mr. Vertz had made a written statement that he was driving his own truck. It is such an inference that counsel for the appellant attempted to leave with the jury.

Appellant's principal objection to the admission of exhibit No. 21 was that it was admitted during cross-examination of a defense witness, when it could have been offered by the state during its case in chief, had the witness been called, or on rebuttal. The admission or exclusion of relevant evidence elicited on cross-examination is a matter which rests within the sound discretion of the trial court, and its determination will not be disturbed on appeal except for abuse. *State v. Hinkley,* 52 Wn. (2d) 415, 419, 325 P. (2d) 889 (1958), and cases cited.

The scope of inquiry on cross-examination of Mr. Vertz necessarily encompassed the nature and contents of the statement. The best evidence of the contents of a written statement is the statement itself. We hold that, under such circumstances, it was within the scope of proper cross-examination to offer in evidence the written statement. *Rogers v. Joughin,* 152 Wash. 448, 277 Pac. 988 (1929); *State v. Gottstein,* 111 Wash. 600, 191 Pac. 766 (1920).

Exhibit No. 21 was not prejudicial for the reason that none of the material factual matters contained in the written statement were refuted by appellant. The state's evidence had previously established these material facts and, in this respect, the statement was merely cumulative. The court did not err in admitting exhibit No. 21.

For the reasons stated, the judgment and sentence is affirmed.

DONWORTH, FINLEY, WEAVER, and HAMILTON, JJ., concur.

---

July 9, 1964. Petition for rehearing denied.