[No. 37215. En Banc. January 6, 1966.]

THE STATE OF WASHINGTON, *Respondent*, v. ROY ALLEN
WILLIS, *Appellant.**

*Reported in 409 P.2d 669.

*Dimmick, Sampson & Savage,* by *Anthony Savage, Jr.,* for appellant.

*Charles O. Carroll* and *Richard M. Ishikawa,* for respondent.

OTT, J.—Roy Allen Willis, alias Lance Miller, alias Allen Kendall, admitted he shot and killed Helen M. Finnie in her apartment at approximately 4:30 a. m. on Sunday, October 28, 1962.

At the trial before a jury, his sole defense was that the homicide was the result of an accident which occurred as he pulled an unlicensed pistol from his pocket, upon arising from a bed on which he had been lying. The pistol then discharged, the bullet striking Helen Finnie almost exactly in the center of her forehead.

The jury returned a verdict of guilty of murder in the second degree. From the judgment and sentence, Roy Allen Willis has appealed.

Relative to the appellant's defense of an accidental homicide, the court instructed the jury as follows:

> As used in the information in said cause and these instructions, "willfully, unlawfully and feloniously" means intentionally and purposely, but not accidentally, and without and beyond the authority of law. Instruction No. 4.

> Homicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means, with ordinary caution and without any unlawful intent. Instruction No. 5.

> When a defendant claims that he killed another by accident or misfortune, the burden is upon the defendant to prove that the homicide was done by accident.

In sustaining such burden of proof, it is not necessary for a defendant to prove this to you beyond a reasonable doubt, nor by a preponderance of the evidence. The defendant sustains this burden of proof and is entitled to a verdict of acquittal if from a consideration of all the evidence in the case you have a reasonable doubt as to whether the killing was done by accident or misfortune. Instruction No. 6.

Every killing of a human being is presumed in law to be without excuse.

Any matter of excuse that may exist for such killing, if such killing you find to be a fact, is a matter of defense. The state is not required to prove affirmatively that no excuse existed.

When the defendant claims that his killing of another is excused, the burden is upon the defendant to prove that the killing was excusable. Instruction No. 12.

An "accident" is an event happening without the occurrence of the will of the person by whose agency it was caused. It is an event that takes place without one's foresight or expectation.

An "accident" is not present when a deliberate act is performed, unless some additional, unexpected, independent and unforeseen happening occurs.

"Negligence" is an unintentional breach of a legal duty causing damage reasonably foreseeable without which breach the damage would not have occurred. Instruction No. 16.

The appellant concedes that these instructions fairly and clearly presented to the jury the law applicable to his defense of an accidental homicide. The appellant assigns error to the court's instruction No. 17 which was as follows:

You are instructed that the law presumes that every person intends the natural and probable consequences of his acts. Intent, therefore, may be shown by the consequences of the act and the circumstances surrounding the commission of the act.

Appellant's primary contention is that the first sentence instructed the jury that the law presumes that every person intends the natural and probable consequences of his acts, which sentence negated his defense of an accidental killing.

When this sentence is taken out of context and quoted as a complete instruction, it could conceivably have misled the jury. When the questioned sentence is read in conjunction with the next sentence in the instruction, the meaning of the word "intends" is fully explained as follows: "Intent, therefore, may be shown by the consequences of the act and the circumstances surrounding the commission of the act."

Intent to kill is seldom admitted by an accused. Intent, in nearly every case, can be established only by the presumption which flows from the circumstances surrounding the act.

What were the circumstances surrounding the commission of this act that tended to establish *intent*, and to which instruction No. 17 related?

The undisputed evidence of the state in this regard established:

(1) The appellant had returned to Helen M. Finnie's apartment about 2 a. m. from having wined and dined another girl friend. He removed the trousers he had worn all evening, and put on a pair which had a pistol in one of the pockets. He then lay down on the bed, knowing the loaded pistol was in his pocket, and awaited the arrival of Helen Finnie.

(2) When she arrived and had partially disrobed, she entered her bedroom and was killed by the appellant. The muzzle of the death weapon was so close to the center of Helen Finnie's forehead that, when the gun was fired, a powder burn more than two inches in diameter resulted.

(3) After the murder, instead of calling the police or summoning help in the apartment house, which would have been consistent with an accidental killing, the conduct of the appellant, as shown by further "circumstances surrounding the commission of the act," was as follows:

(a) He stole the money from his victim's purse and from her dresser.

(b) He mopped the blood of his victim from the floor.

(c) He removed his fingerprints from everything he had touched.

(d) He wrapped her body in a blanket, and covered her head with towels to keep the blood from dripping in the hallway as he carried the body to his car and placed it on the back seat.

(e) After he had driven several blocks to an unoccupied parking lot, he removed the corpse from the back seat and put it in the trunk.

(f) Near Mount Vernon, he left the main highway and drove some seven miles to a deep ravine near a river, then carried the body and deposited it where it would not readily be found.

(g) He then drove to Calgary, Canada, where he disposed of his bloodstained shoes, shirt, and trousers, and from there drove to Regina and Balgona, Canada, where he stayed for several days, during which time he buried the pistol and disposed of the remainder of the bullets.

(h) He cut the bloodstained upholstery out of his automobile, and removed the bloodstained floor covering from the trunk.

(i) He was apprehended in Canada, using an assumed name.

(j) In his confession, he stated he thought he could "beat the rap" by his escape, disposition of the body, and obliterating the evidence of his guilt.

The jury believed that the factual incidents and circumstances narrated above were inconsistent with any theory of an accidental killing, but, instead, established an intent to kill, as explained in instruction No. 17, and returned a verdict of guilty of murder in the second degree.

■ Proof of the circumstances surrounding the commission of an act is proper to establish intent on the part of the accused, and has been recognized as the law in Washington for more than 70 years. *State v. Payne*, 10 Wash. 545, 39 Pac. 157 (1895). It is also the law in the other 49 states of the union.

■ Each instruction must be considered in the light of all of the instructions given. *State v. Stafford*, 44 Wn.2d 353, 355, 267 P.2d 699 (1954); *State v. Refsnes*, 14 Wn.2d 569, 572, 128 P.2d 773 (1942). It is not possible to include

all of the legal issues and definitions in a single instruction. It is presumed that a jury reads and follows the court's instructions and considers them as a composite unit. *State v. Costello,* 59 Wn.2d 325, 332, 367 P.2d 816 (1962), and case cited.

We cannot assume that the jury disregarded instructions Nos. 4, 5, 6, 12, and 16, and considered only those instructions which related to the proof necessary to establish evidence of guilt.

■ When the questioned sentence in instruction No. 17 is not taken out of context, but is read in conjunction with the explanatory sentence, "Intent, therefore, may be shown by the consequences of the act and the circumstances surrounding the commission of the act," the jury was not misled.

Applying these well established rules to the questioned instruction, we find no merit in appellant's first assignment of error.

Appellant next assigns error to the court's instruction No. 14 which was as follows:

> You are instructed that under the laws of the State of Washington no person shall carry a pistol in any vehicle, or concealed on or about his person, except in his place of abode or place of business, without a license therefor.
>
> You are further instructed that in the trial of a person who has been charged with a crime of violence, the fact that the defendant was armed with a pistol and had no license to carry same shall be prima facie evidence of his intention to commit such crime of violence.
>
> "Prima facie evidence" means evidence which may be accepted for proof of a particular fact. Such evidence even if not refuted by the defendant, should be given just such weight as it seems to you to merit.

This instruction is predicated upon the following statutes:

> No person shall carry a pistol in any vehicle unless it is unloaded or carry a pistol concealed on his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided. RCW 9.41.050.

In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol and had no license to carry the same shall be prima facie evidence of his intention to commit said crime of violence. RCW 9.41.030.

The appellant states that "The instruction [No. 14] is a correct statement of the basic law of this state," but contends that the evidence established that appellant came within the exception provided in RCW 9.41.050 because, in the one night and part of another that he had been a guest in Helen Finnie's apartment, coupled with his assertion that she had invited him to stay for an additional three days (until the end of the month), the premises became "his place of abode."

█ Whether, as appellant contends, he had established that Helen Finnie's apartment was "his place of abode" was a question of fact to be resolved by the jury. In this regard, Miss Margaret Conklin testified that she was the roommate of Helen Finnie during the time in question, and that, as late as the afternoon of October 27, 1962, the day before the homicide, she saw no indication that a man had moved into the apartment. Further, the appellant testified that he resided in Canada, where he had a common-law wife and three children.

There was ample evidence from which the jury could have concluded that the appellant's presence in the apartment was insufficient to establish it as his abode. Under these circumstances, instruction No. 14 was properly given.

█ Appellant's third assignment of error is that the trial judge twice commented on the evidence, which denied him a fair trial. This assignment relates to colloquies among the deputy prosecuting attorney, counsel for the appellant, and the court. In the instances cited, the court, in overruling an objection, merely stated its reason for the ruling. The court's statements were not comments on the evidence; hence, did not violate the constitutional prohibition. *State v. Ingle*, 64 Wn.2d 491, 499, 392 P.2d 442 (1964); *State v. Jenkins*, 19 Wn.2d 181, 190, 142 P.2d 263 (1943), and case cited; *State v. Adamo*, 128 Wash. 419, 424, 223 Pac. 9 (1924),

and cases cited; *State v. Surry*, 23 Wash. 655, 660, 63 Pac. 557 (1900).

Further, in connection with the alleged comments, the jury is presumed to have followed the court's instruction No. 24, which was as follows:

> Under the Constitution and laws of this State, the Court is prohibited from commenting upon the facts in this case or upon the credibility of any witness who has testified before you. The Court has not intentionally commented upon the facts in this case or upon the credibility of any witness who has testified before you, but if it has seemed to you that during the course of the trial, or in the giving of these instructions, the Court has said or done anything that would appear to be commenting upon the facts or upon the credibility of any witness, it is your duty to entirely disregard the same, and determine the facts solely from the evidence that has been admitted in the case.

Appellant's fourth assignment of error is predicated upon alleged prejudice resulting from the following statement made by Detective-sergeant Roberts, a Canadian officer, who arrested the appellant in Canada:

> Q. When he was ultimately taken into custody was it on a State of Washington warrant, because of a State of Washington warrant? A. No, sir. I charged him with a Canadian offense.

A motion for mistrial was made and argued in the absence of the jury. The officer stated that, at the time of the arrest, appellant was also wanted in Canada for the offense of forgery and uttering a forged instrument, which charge was formally filed on the same afternoon, and that his statement was innocently and inadvertently made.

The court, relying upon *State v. Goebel*, 36 Wn.2d 367, 218 P.2d 300 (1950), ruled that the statement was not prejudicial. The court then inquired of appellant's counsel whether he desired the court to instruct the jury to disregard the witness' statement relative to the Canadian offense. The appellant chose not to have such an instruction given. Thereafter, the appellant took the stand in his own defense

and, upon direct examination, was asked the following question:

> Q. Now, you were arrested by Sgt. Roberts on the basis of the charge here in Seattle, is that correct? A. When he arrested me he said that I was under arrest for murder, that I was wanted in Seattle for murder; that's correct.

The appellant also admitted that he had previously been convicted of two felonies. Under these facts, the inadvertent statement made by the officer did not prejudice the appellant.

Finally, appellant contends that the words "intentional and voluntary" should have been included in the first sentence of instruction No. 17.

 The words "intentional and voluntary" preceding the word "acts," in the first sentence of instruction No. 17, would do nothing more than to present to the jury an amplified instruction. We have recently held that, although the addition of amplifying words to a questioned instruction might make it more perfect, this fact alone does not make the unamplified instruction erroneous or prejudicial. *Dole v. Goebel, ante* p. 337, 407 P.2d 807 (1965).

In the instant case, 26 instructions containing more than 3,600 words were given by the court. Many instances could undoubtedly be noted where descriptive words would have amplified, improved, and made these instructions more perfect. However, the framers of the constitution, in their wisdom, did not require that criminal trials be judicially perfect, but guaranteed a fair trial, measured by *reasonable* standards. *State v. Ingle, supra,* at 499; *United States ex rel. Weber v. Ragen,* 176 F.2d 579, 586 (1949).

The appellant's theory of an accidental killing was fully and properly presented to the jury by the instructions. The instructions relative to accidental killing, and appellant's testimony which alone supported this theory, were weighed and considered by the jury. By the verdict, the jury found that appellant did not establish that the killing was accidental.

The appellant in all respects had a fair trial, free of prejudicial error. The judgment and sentence is affirmed.

ROSELLINI, C. J., HILL, WEAVER, HUNTER, HAMILTON, and HALE, JJ., concur.

FINLEY, J. (dissenting)—The majority opinion inventories, marshals and, it seems to me, emphasizes somewhat gratuitously certain inflammatory facts and circumstances relating to resolution of the ultimate question of the guilt of the accused, Roy Allen Willis. Certain errors allegedly occurring in the trial of the accused relate to instructions and to the possibility of improper comment by the trial judge. These matters seem to be crucial in my judgment. They relate not to the question of the guilt or innocence of the accused, but to the fundamental issue of whether he was accorded a fair trial. Our function in the instant case as an appellate court is not quite that of the trial jury; *i.e.,* deciding upon the ultimate question of the guilt or innocence of the accused. Rather, it is to carefully isolate and evaluate the errors urged on appeal which allegedly prevented the accused from having a fair trial.

The facts, as emphasized and urged by defense counsel, paint, it seems to me, at least a somewhat less bleak and black picture of the accused than is indicated by the majority. With this perspective somewhat in mind, coupled with the firm belief that two of the errors assigned are too significant to be treated as nonprejudicial to the accused, I am persuaded to disagree with the majority, and I shall commence with a review of the facts as I see them.

The defendant, Roy Allen Willis, is appealing a conviction of second degree murder. Some of the significant circumstances in this case relate back in time. Willis was born in Ontario, Canada, in 1932. Life's realities started for him in an orphanage and continued with sojourns of various lengths in a series of temporary homes until he was 16 years of age. Then, so to speak, he struck out on his own as his own man. But the resulting overtones or implications were inconsistent with Horatio Alger theses and nomenclature. The conduct or activities of Roy Allen Willis, as if "acting out"

frustration and hostility, were negative rather than socially affirmative. In very short order he was involved in the toils of the law, charged and convicted of "joy-riding," and for this he spent 10 months in confinement. Within 6 months after his release, he was convicted of burglary, and then spent 20 months in confinement. This conviction around 1951, albeit, was his last until the present instance.

An attempt by Willis to join the Canadian armed forces was abortive because of his criminal record. He came to the United States, adopted an alias, and worked as a magazine salesman for approximately 2 years before the immigration authorities deported him. He tried to return to the United States legally, but again, his criminal record blocked this. Once again, he did enter the United States illegally, and this time he was deported with threats of imprisonment if he returned. Despite these warnings, Willis moved to Alaska in December 1960, and settled in Anchorage.

In early October 1962, Willis made a fateful trip to Seattle. He stayed first at the Waldorf Hotel, and then with a friend by the name of Danny Anamura. Soon after his arrival in Seattle, Willis renewed an acquaintanceship with Helen Finnie (now deceased), whom he had met 2 years before. At her suggestion he moved into her apartment on Friday, October 26, 1962, intending to remain there until the prepaid rent period expired.

On Saturday, October 27, 1962, Willis drove to Snoqualmie Pass to do some sketching. Apparently, art was his chief interest in life. He returned to the apartment about 9:30 p.m. He then called a Miss Laney and arranged to meet her and some other friends from his "magazine selling" days at the Moore Hotel. After the bar closed, he and Miss Laney went to two other night clubs in Seattle, and eventually returned to the Moore Hotel. Willis made a dinner engagement with Miss Laney for the next day, and then returned to Helen Finnie's apartment. According to the defendant's testimony, he changed his trousers at the apartment ostensively because of a drink that Miss Laney had spilled on them. In the pocket of the trousers into which he changed was an unlicensed pistol he had brought back

with him from Alaska. Without removing the pistol from the pocket of his trousers, Willis lay down on the bed, where he fell asleep.

Meanwhile, according to the testimony of defendant Willis, Miss Finnie (a barmaid at the Cabellero Tavern in Seattle) had secured the night off to accompany two other barmaids of the establishment and three Seattle police officers for a night on the town, terminating with Miss Finnie's arrival at her apartment between 3:40 and 4 a. m. Miss Finnie had started to prepare for bed when Willis awoke. As they were talking, Willis sat up on the bed, and the pistol in his pants pocket bit into his side. As he extracted the gun from his pocket it discharged, the bullet hitting Miss Finnie in the head.

Willis testified that he "panicked" when he considered his record and the circumstances. He wrapped the body in a blanket and towels, packed his own clothes, wiped his fingerprints from the apartment, and left. He abandoned the body near Sedro Woolley, and fled to Canada. The body was later discovered, still clad in underwear and decedent's watch on her arm. There was no indication of physical abuse other than the single bullet wound.

Willis voluntarily waived an extradition hearing in Canada, even though he had prevailed in one habeas corpus hearing. He stated that he wanted to return to Washington to clear himself, and he freely related the fatal incident to the Seattle police.

Much of the foregoing fact pattern respecting the activities of Willis and the demise of Helen Finnie comes from the uncorroborated testimony of defendant Willis. However, I have reconstructed the pattern of events asserted by the defendant, such as it is, to illustrate the effect that alleged trial errors could have had on the defense presented to the jury by the defendant in his unsuccessful attempt to avoid conviction of the crime charged. He relied completely upon an effort to convince the jury that the homicide was accidental, and he claims that a major blow against this effort was precipitated when the trial court gave instruction No. 17:

> You are instructed that the law presumes that every person intends the natural and probable consequences of his acts. Intent, therefore, may be shown by the consequences of the act and the circumstances surrounding the commission of the act.

The appellant-defendant attacks this instruction on the ground that it assumes the very fact which he was trying to refute; namely, the instruction implicity assumes that the "act" of shooting the gun was in fact an intentional and voluntary act. I agree with the defendant. As a leading treatise states:

> The presumption that the defendant intended the natural and probable consequences of his acts applies only when the defendant has voluntarily and intentionally committed the acts for the consequences of which he is later prosecuted. 1 Wharton, Criminal Evidence § 131 (12th ed. 1955).

This distinction was also recognized by another state supreme court:

> For whatever else may be said about instructions concerning presumptions of intent, it is at once obvious that the "presumption" stated does not arise except it be predicated upon an intentional act. *State v. Martin*, 260 S.W.2d 536, 538 (Mo. 1953).

Although I believe that under the particular circumstances of this case error was committed by the trial judge in presenting instruction No. 17 to the jury, I also think that the essence of the instruction, if qualified as indicated hereinafter, could have been presented to the jury. The point is this: There are two possible inferences which can be derived from the discharge of a pistol. While it is reasonable to infer that the discharge was the effect of an intentional act, it may be inferred also that the act causing the gun to discharge, or the discharge of the gun itself, was accidental. The latter inference may seem less likely, but it is unfair to the defendant to give an instruction to the jury which implicitly assumes that the discharge resulted from an intentional act. I note that because of the circumstances of this case the state was unable to produce evidence that

the firing of the gun resulted from an intentional act. Of course, the circumstantial evidence supported an inference that the firing was the product of an intentional act, but this inference was contradicted by the defendant's direct testimony that the gun discharged accidentally. With the evidence and the inferences therefrom in such conflict, the proper use of instruction No. 17 called for language that would inform the jury that the presumption applies only if they believe, beyond a reasonable doubt of course, that the act of discharging the gun was an intentional or voluntary act. It is also possible to rectify the instruction by modifying the word "act" therein, making the instruction read:

> You are instructed that the law presumes that every person intends the natural and probable consequences of his *intentional and voluntary* acts. Intent, therefore, may be shown by the consequences of the act and the circumstances surrounding the commission of the act. (Added words are in italics.)

An instruction so worded would not defeat the use of the presumption in the state's case if the jury should believe the act was intentional, and the instruction would properly remind the jury that they must decide whether the act was intentional or accidental. Thus, the state would have the full benefit of the inferences derivable from the circumstantial evidence, and at the same time defendant's defense would not be buried under an implicit assumption hidden in the instructions.

I note that the state already had the benefit of instruction No. 10:

> The court instructs you that where a homicide is proved beyond a reasonable doubt, the presumption is that it is murder in the second degree, and if the defendant desires to reduce the degree to manslaughter, the burden is on him to produce evidence of those facts or circumstances which call for such reduction.

This instruction has been part of our law since *State v. Payne*, 10 Wash. 545, 553, 39 Pac. 157 (1895), and the state has cited many cases to uphold this instruction. Several of

these cases contain statements that approve the use of a presumption that a person intends the natural and probable consequences of his acts. The jury must be informed that the word "act" refers to intentional acts.

There is little doubt in my mind that the error in instruction No. 17, discussed above, was potentially quite prejudicial. *Funches v. State*, 148 So.2d 710, 711 (Miss. 1963). A jury receives instructions on the law from the trial judge. These are intended and designed to guide and circumscribe the deliberations of the jury. Obviously, they do perform that function. The court should not speculate at apparently a very great risk to the defendant on the question of whether the jurors in this case were aware of the fact they could quite properly interpret the word "acts" in instruction No. 17 to refer only to intentional acts. Since this particular error bears strongly on the propriety of the defense afforded to the appellant-defendant, I believe the only way to avoid prejudice and to afford fair treatment to the accused requires granting a new trial.

Error is also assigned to instruction No. 14, which stated:

You are instructed that under the laws of the State of Washington no person shall carry a pistol in any vehicle, or concealed on or about his person, except in his place of abode or place of business, without a license therefor.

You are further instructed that in the trial of a person who has been charged with a crime of violence, the fact that the defendant was armed with a pistol and had no license to carry same shall be prima facie evidence of his intention to commit such crime of violence.

"Prima facie evidence" means evidence which may be accepted for proof of a particular fact. Such evidence even if not refuted by the defendant, should be given just such weight as it seems to you to merit.

Instruction No. 14 apparently was keyed directly to the following two statutory provisions:

*RCW 9.41.050*: No person shall carry a pistol in any vehicle unless it is unloaded or carry a pistol concealed on his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided.

> *RCW 9.41.030*: Being armed prima facie evidence of intent. In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol and had no license to carry the same shall be prima facie evidence of his intention to commit said crime of violence.

Two other statutory provisions are somewhat pertinent, and read:

> RCW 9.41.070: Alien's license to carry firearms. It shall be unlawful for any person who is not a citizen of the United States, or who has not declared his intention to become a citizen of the United States, to carry or have in his possession at any time any shotgun, rifle, or other firearm, without first having obtained a license from the director of licenses, and such license is not to be issued by the director of licenses except upon the certificate of the consul domiciled in the state and representing the country of such alien, that he is a responsible person and upon the payment for the license of the sum of fifteen dollars. Nothing in this section shall be construed to allow aliens to hunt or fish in this state without first having obtained a regular hunting or fishing license. Any person violating the provisions of this section shall be guilty of a misdemeanor.
>
> RCW 9.41.040: Certain persons forbidden to possess arms. No person who has been convicted in this state or elsewhere of a crime of violence, shall own a pistol or have one in his possession or under his control.

The latter two statutes certainly prohibit and make it illegal for an alien or a person convicted of a crime of violence to carry a pistol. Obviously, such a person could not be lawfully licensed to carry a pistol. But the particular error urged by appellant in this appeal raises a factual question under RCW 9.41.050 as to whether Helen Finnie's apartment can be said to have been appellant's place of abode. As to this the evidence in the record is dubious and conflicting. The issue was a factual one for the jury. I think it was properly submitted under instruction No. 14, set out above, and find no merit in this assignment of error.

The state argues that the instructions were not prejudicial to the defendant as all were read and considered as a

whole. I cannot agree. It appears to me that the combination of instruction No. 10 (the presumption of second degree murder) with the faulty instruction No. 17 (the unconditional presumption that a person intends the natural consequences of his acts) produced an unfair trial. This is to me quite convincing, considering the effect of the presumption on the minds of jurors faced with a defense of accident that depended entirely upon the defendant's own testimony.

The defendant also alleges that error occurred when the trial judge made two comments that indicated disbelief in the defendant's testimony, thus again damaging the veracity of his defense of accident in the eyes of the jury. The pertinent portion of the record reads as follows:

> A. (by the defendant) With the Court's indulgence, your Honor, the prosecutor is trying to twist a phrase of mine. . . . Q. (by the prosecutor) Mr. Miller [Willis], no matter what you think of my attempt to twist your testimony—Mr. Savage (Defense Attorney): I object to the speech that Mr. LaRose is making before—every time he asks a question. He can ask a question without making remarks like that very easily. THE COURT: Well, the witness kind of invited it, Mr. Savage. Mr. Savage: With all due respect to the Court, I would object to that. THE COURT: Well, you may object to it. But he accused the prosecutor of twisting it, and he was saying despite that— Mr. Savage: Could I take up a matter with the Court now? THE COURT: No, you may not. You may do it at recess time. Mr. Savage: May I make a record at recess time on this matter? THE COURT: Yes.

And, at a slightly later point, the following transpired:

> Q. (By Mr. LaRose) Mr. Miller [Willis], let's move for a moment to the extradition proceedings. Do you know when the first fugitive warrant was obtained for you? A. No, Sir. Q. Could it have been between the 10th and 15th of November, 1962, during that period when you were arrested? Mr. Savage: Objection, your Honor. If he doesn't know he is guessing. He just testified he doesn't know. THE COURT: Well, he must have some knowledge, I presume, of the proceedings, and counsel may inquire to find out what his knowledge is. Mr. Savage: May I—I am sorry, your Honor. I would like—THE COURT: You may make your objection. Mr. Savage: I

most respectfully object to the Court's comment. THE COURT: I didn't make a comment, Mr. Savage. The testimony is brought out that he attended the extradition hearing continuously. There is no comment on the evidence. Counsel is entitled to find out some information about it.

It is convincing to me that these comments were damaging to the defendant's case. The court has very recently fully explored the constitutional prohibition respecting trial judge comments before a jury. *State v. Bogner,* 62 Wn.2d 247, 382 P.2d 254 (1963). In that case we quoted the early law of this state:

" . . . It is not the *quantum* of any particular comment, but all comment whatever, that is inhibited by the constitution; and, therefore, courts should be extremely careful to confine their instructions solely to declaring the law. All remarks and observations as to the facts before the jury are positively prohibited, and if any such are made, the judgment will be reversed unless the appellate court can see that the accused was in no wise prejudiced thereby." *State v. Bogner, supra,* at 252, quoting *State v. Walters,* 7 Wash. 246, 34 Pac. 938 (1893).

As already indicated, it is difficult and too speculative for me to say that the "accused was in no wise prejudiced" by the above quoted remarks of the trial court, and this seems an additional ground for granting a new trial.

Finally, the defendant also claims error in the trial court's refusal to grant a mistrial when a Canadian officer inadvertently testified to unrelated Canadian charges against the defendant.

For the reasons indicated, I think that a new trial should be ordered.

DONWORTH, J., concurs with FINLEY, J.