[No. 40434.    En Banc.    March 5, 1970.]

THE STATE OF WASHINGTON, *Respondent,* v. ERNEST JAMES
TYLER, *Appellant.**

*Reported in 466 P.2d 120.

*McDonell & Alfieri*, for appellant (appointed counsel for appeal).

*Charles O. Carroll* and *Paul M. Acheson*, for respondent.

HALE, J.—It was a tragic twist of fate that brought Ada White and Mary Robertson to the rear entrance of the Town House Apartments at about 2 o'clock in the morning. They had taken Mary Robertson's dog for a brief outing, and a few minutes earlier or later would have escaped the defendant. As things turned out, the short stroll cost Ada White her life and brought the defendant before the court for murder in the first degree. The murder of Ada White was but one of eight felony counts set forth in the amended information filed against Ernest James Tyler in the Superior Court for King County.

Count 1 charged him with the robbery of Douglas Ralph Schley by means of a deadly weapon on February 21, 1968. Count 2 charged him with the robbery of Alfred Knapp on February 22, 1968; count 3 charged assault in the first degree with a deadly weapon committed upon Alfred Knapp in perpetrating the robbery. Count 4 charged Tyler with the robbery of Stanley Burrell while armed with a deadly weapon on February 22, 1968; count 5 charged assault in the first degree committed upon Stanley Burrell while perpetrating that robbery. Count 6 accused the defendant of

the attempted robbery of Ada White, February 22, 1968; and count 7 charged the first-degree murder of Ada White committed both with a premeditated design to effect her death and while engaged in committing, attempting to commit or withdrawing from the scene of a robbery. Count 8 charged the defendant with the attempted robbery of Mary Robertson February 22, 1968.

The jury found Tyler guilty on each of the eight counts and returned a special verdict on each count that at the time of the commission of the crime he was armed with a deadly weapon. It returned a special verdict on count 7, the first-degree murder count, that the death penalty be inflicted. From a judgment sentencing him to life imprisonment on each count except count 7 and to death in accordance with the verdict of the jury on count 7, the defendant appeals. The evidence supports the judgment. There is abundant credible evidence in the record to permit the jury to find the defendant guilty of murder, robbery and assault as charged in the eight counts.

In addition to a general plea of not guilty to each count, the defendant entered a special plea of insanity and mental irresponsibility, alleging he was insane and mentally irresponsible at the time of the commission of the acts charged, and that thereafter he became, and at the time of plea was, sane and mentally responsible. Since the defendant assigns error to the court's withdrawal of this plea of insanity and raises other points concerning his mental condition, it will be necessary to relate the evidence in detail as to his actions and demeanor.

At about 2 a.m., February 21, 1968, Douglas Ralph Schley was finishing his shift as a bartender in the Pee Wee Tavern, Seattle, when the defendant walked in and sat at a stool opposite the cash register. Mr. Schley served him a schooner of beer which he paid for. When everyone had left the tavern, the defendant ordered a 6-pack of Budweiser, and Mr. Schley walked to the cooler to fetch it. Tyler walked toward the cooler with Schley. Schley testified that, when he bent over to reach the 6-pack, the de-

fendant put a gun to his head and said, "You know what this is . . . Let's get with it. I am going to kill you." Schley said the defendant uttered a few obscenities, told him to shut up, and repeated that he would kill him. Under menace of the gun, the bartender then went to the cash register and took out all the cash and change. He said the defendant would not touch the money and insisted that he open the safe. Complying with Tyler's orders, Schley put all of the money from the cash register—bills and change—into a paper bag and handed it to the defendant. The defendant took the bag and said, "Let's take the safe," and followed Schley to the back room. Schley told Tyler that he did not have the combination, and the defendant replied, "Don't get smart with me, or I will kill you."

In the tavern's back room, the defendant, still holding the gun on him, took his keys and wallet which held not over a dollar, and when Schley asked him to leave the wallet, the defendant uttered some more obscenities and again said he was going to kill him. Just about the time he was taking the wallet and keys, Schley said, the defendant acted as though he heard something, and walked out of the back room. Schley closed the door and it locked automatically, and he heard the defendant try the key in the door and say, "Open up, or I will blow the door." Schley waited 5 minutes, but heard no sound of the defendant leaving. He then opened the door, found the defendant gone, and telephoned the police. Schley identified the defendant in a police lineup and in court as the man who had robbed him. He described the defendant as a "Nice looking guy," with "kind of crazy" eyes, but amplified that statement to say that he meant by it that the defendant was not to be reasoned with, could not be talked out of anything, and had to be "out of his brain," adding that "Anybody that goes around shooting people is not reasonable."

The next count charged robbery of and assault upon a taxi driver. Alfred T. Knapp, early in the morning of February 22nd, was seated in his Grey Top cab at Queen Anne and Mercer Streets when a radio call directed him to Dez's

400 Tavern. He parked his cab at the front door and, walking into the tavern, asked the bartender who had called a cab. The bartender indicated Tyler, who nodded and followed Mr. Knapp to the cab. Tyler opened the front door and seated himself beside the driver. He told Knapp he wanted an address on Eastlake and said, "Drive to the corner and turn right," a direction which would take them north. Mr. Knapp followed these directions for a while and as they crossed Taylor Avenue he turned to his passenger and asked what part of Eastlake the defendant wished. The defendant, now with a gun in his right hand pointed at the driver's ribs, said, "Never mind, Eastlake." He directed Knapp to drive up into an alley in the 550 block of Roy Street and then ordered him to turn off into a wide space in the alley and stop. Knapp testified that, while holding the gun. "He went through my pockets. He asked for my money, and I took everything out that I had in my pockets and gave it to him." Describing how Tyler, in making a search, felt a strap on his body and struck him with the pistol, Knapp then testified:

A. Yes, he felt the strap. I have an artificial leg, and he felt the strap on the leg, and he said, "Do you have a money belt?" Q. What was your response? A. I said, "No, that is a strap on my leg." Q. And then what happened? A. He ordered me to get out of the cab on the left-hand side, on the driver's side and not move. Q. And did you comply with this? A. I did. Q. And then what occurred? A. He walked me over to the corner of the back of the house where there is a garbage dumpster. Q. By that, what do you mean? A. Well, it is disposal. Companies put them out. They hold several garbage cans. They are about four feet high roughly. Q. And you say he directed you to one of these? A. Yes, and he laid the lid on the ground of the garbage dumpster and took his left hand and spread everything out that was in there and then ordered me to get into it. Q. Did you make any statements with respect to his request? A. I told him I couldn't get into it. Q. Did you explain to him why? A. Yes. Q. What did you say? A. I said, "I have an artificial leg. I cannot get up that high." Q. And at that point, then what happened? A. He ordered me to turn around and face the dumpster. Q. And did you comply with this re-

quest? A. Yes. Q. And what happened following this? A. Well, he stood at my back. Q. Were you able to hear or see anything that was going on behind you? A. I was able to hear that gun click in my back. Q. And then what occurred? A. Well, it was only a few seconds. He said, "I won't hurt you." And with that, he hit me on the head. Q. And after being hit on the head, did you remain conscious or lose consciousness? A. I lost consciousness for a few seconds.

Mr. Knapp went on to say that the defendant took $42 from him and that he had to be taken to the hospital where he got his head stitched. The papers inside his wallet were never returned. He described his assailant to the police as being about 6 foot 2 inches and weighing 175 to 180 pounds, clean shaven, of sandy complexion and wearing a black raincoat and a colored shirt. He identified the defendant in a police lineup later that day, February 22nd, and again in court at the trial, as the man who had robbed and slugged him with the pistol.

Mr. Knapp testified that, during the robbery, the defendant took the inside of his wallet and business cards, saying, "I will take these because they have my fingerprints on them," and that he appeared to know what he was doing. On cross-examination, Mr. Knapp said that, throughout the robbery, defendant was very calm, acted normal in perpetrating a robbery and was, as he put it, all business. Describing Tyler's normal manner to the jury, he said, "he went about what he was doing in a normal sort of way . . . Just like he was concentrating on what he was doing," and that he seemed without apparent nervousness, apprehension or fear.

Another taxicab driver who crossed defendant's path that early morning of February 22nd in Seattle was Stanley Burrell. As Mr. Burrell sat in his Farwest cab parked at 6th and Pike reading a newspaper, the defendant opened the front door, climbed in and told Burrell to take him to the 200 or 300 block on Belmont East. Burrell drove to where he thought the defendant had directed but the latter said, "Keep driving. I will recognize it when I see it." Tyler seemed to know where he wanted to go for he said to the

driver, "Make a right on Roy and a right on Boylston, and I will recognize it." When they came to a dark street, the defendant said, "This is it," and the driver stopped in front of some open-front garages. The defendant, now with a gun in his lap pointing at the driver, then said, "This is it. I want all your money." Mr. Burrell, attempting a ruse, took out his billfold to show the defendant that it was empty but the defendant said, "You must have some starting money," and reaching over extracted eight or nine $1 bills from the driver's shirt pocket. The defendant said, "Dig again," and the driver then produced a handful of change and handed it to the defendant.

Tyler then directed Burrell to drive the cab into an open garage and told the driver to let the motor run. He ordered the driver to get up in front of the car and face the wall and take off his coat. Next, according to Burrell's testimony:

A. Then he stepped back, and I heard the click of a gun. I don't know whether he was loading a gun or unloading it. I have no idea, with me facing the wall, and the next thing I knew I got clonked on the head. Q. And did you lose consciousness at that time? A. Not completely, no. Q. What did you do? A. I went down on one knee and stayed there, and he immediately got in the car and drove away.

The driver called the police, describing the defendant as "a tall fellow, with a dark topcoat on, looked like a raincoat, light weight, and I says dark haired, possibly six, six-one tall, and large prominent chin, and clean shaven and dark trousers." Burrell was taken to the hospital where stitches were taken in a scalp wound inflicted by the blow with the gun.

There were two more attempted robberies and a murder. Mary Robertson and her husband had come to Seattle from Port Angeles to visit her sister-in-law, Ada White. Ada White, the widow of a retired army officer, worked at the Seattle Convalescent Center as a registered nurse and had lived at the Town House Apartments for about a year. The Robertsons had visited her there about once a month.

The Robertsons had dinner with Mrs. White at her apartment on the 11th floor that evening of February 21, 1968, and after dinner the three talked and watched television. When the late movie had been on for about 35 minutes, they concluded it wasn't worth watching and decided to go to bed. The Robertsons had brought their dog with them and felt they should take it outside.

Mary Robertson and Ada White left Mr. Robertson in the apartment, and, putting the dog on a leash, took the freight elevator which carried them down to the fourth floor where the rear entrance to the Town House was located. At the fourth floor, the two ladies, leading the dog on its leash, turned right from the elevator and walked out the back door, down some steps and through the portico into the parking area. There they unleashed the dog and walked to the end of the apartment house parking lot. After the dog had run for perhaps 10 minutes, Mrs. Robertson observed the form of a person walking rapidly up the steps from the street and come to a stop at the top, and then back into the shrubbery—a large hedge. She could discern the body of a man outlined in the back by lights from an apartment.

Mrs. White's back was turned to the figure but Mrs. Robertson asked her if she had seen it and told her where to look without pointing. Alarmed, the two ladies started back to the apartment without waiting to leash the dog. They walked rapidly and had just reached the bottom of the steps at the lighted portico when a voice said, "Just a minute, ma'am." They both turned to see a man in a dark overcoat with a gun pointing right at them. His tone was, as she described it, "Just clear, loud voice, not a shout." He then said, "I want your money. I want your wallets." Both ladies replied, "we have no money," and walked up the steps to the well-lighted landing. The defendant followed them to the entryway of the apartment house and with pistol in hand aimed between them said, "I am serious. I mean this. I want your money. I want your wallets," and the ladies again said that they had no money and Mrs. Robertson held up her hands so he could search her, which he did.

Holding the gun in his right hand, Tyler drew a small coin purse from Mrs. Robertson's pocket which she did not realize was there because the coat belonged to Mrs. White. He returned the coin purse to Mrs. Robertson's pocket, she thought, because it was jeweled and resembled a lady's compact. She then lifted her arms slightly while the defendant searched the other pocket.

Then Mrs. Robertson, who had the key, put the key in the lock, opened the entrance door and walked through the doorway followed closely by Mrs. White. Mrs. Robertson ran to the elevator and reached for the elevator button. She pressed the button and stood to the right of the elevator while Mrs. White stood on the left of the elevator and the defendant moved to and stood in the entry doorway, blocking the door opening. The three stood there in silence for a few moments and the two women could hear the elevator approaching their floor. The defendant remained there silently with his gun pointing between them. Then, as the elevator came nearer, he said, "If there is a husband upstairs it is going to be bad for him." The silence continued and the elevator reached the floor and nothing more was said, and then, as Mrs. Robertson testified:

A. Then the elevator reached our floor. The door slowly started to open, and suddenly he reached out, this man reached out with his arm and flung Mrs. White, flinging her around so she hit the wall, straightened up, and when she straightened up she was facing him directly. Q. What did he do, if anything, with the gun at that time? A. He raised the gun. Q. Were you watching the gun? A. I was watching the hand and the gun and Mrs. White's face. Q. Would you describe what actions he took with the gun? A. He raised the gun from waist position where it had been most of the time, raised it—Q. To what level? A. —about heart level as far as Mrs. White is concerned, and then I heard the report. Mr. Alfieri: Your Honor, I am having great difficulty hearing. The Court: We didn't hear this last. The Witness: He elevated the gun, raised his hand slowly, quite steadily, very steadily, and shot. Q. (By Mr. Acheson) did he make any forward movement at all with the gun? A. Slightly, yes, yes. Q. And what happened then? What did you do then? A. The hand and the gun disappeared.

I was watching Mrs. White. Q. What was Mrs. White doing? A. She slumped against this wall and spoke to me and said, "Mary, he shot me."

Mrs. Robertson helped Mrs. White to her apartment and called the police. Ada White died at the hospital a short time later. Mrs. Robertson described the defendant to the police as "a tall man, at least six feet, long, long face, dark wavy hair, quite erect in stature, wearing a dark, either dark blue or black raincoat," and identified him in the courtroom and at a police lineup as the man who robbed them and shot Mrs. White.

The defendant was arrested a little while later at the corner of Summit and Olive in Seattle about six blocks from the Town House Apartments. He had hailed a taxicab, got in the back seat, and had calmly given the driver explicit directions. The driver started the cab but had moved no more than 40 feet when police officers surrounded it. The driver, referring to the defendant, testified, "Yes, he got in and very nonchalantly said, 'Take me over to 720 Queen Anne, will you?'" Watching the police officers search Tyler, the driver saw a gun in his belt. Throughout the capture and arrest, said the taxi driver, the defendant appeared very quiet, very calm and did not appear to be intoxicated.

Police officers who captured and arrested Tyler corroborated this description, testifying that the defendant at the time of his arrest understood and obeyed their directions and that he appeared normal. Testimony given by the victims of the assaults and robberies and the police officers who captured him describing his demeanor, appearance and actions enabled the jury to believe that, throughout the interval of time preceding, during and immediately following each crime, the defendant was mentally responsible, knew what he was doing, understood the moral nature of his acts and comprehended their legal consequence.

Defendant makes 11 assignments of error, some of which do not merit discussion; others will be dealt with in combination. His first assignment of error concerns the court's refusal to direct the prosecuting attorney to furnish him

736

with copies of "the written statements given by the State's witnesses to the police and to the Prosecutor." Copies of all written statements given by the state's witnesses to the police and to the prosecutor were requested by the defense before trial. The prosecuting attorney, answering this request, stated that he would supply the names and addresses of all witnesses the state intended to call, but objected to furnishing the defendant with their written statements. Little is shown in the record or briefs to overcome the prosecution's objections. Other than to assert that, from past experience, police officers are reluctant to discuss their testimony with defense counsel, the defendant neither showed nor offered to show any reasons why the court should, in advance of trial, order the production of any or all of the written statements.

■ It is a general rule in this country, supported, we think, by the great weight of authority, that the prosecuting attorney is under no general obligation to submit any evidence he has in his possession to counsel for the defense. This rule applied to the written statements of witnesses as well as to substantive evidence. Whether the court will direct the production of written statements of witnesses in advance of trial, or at all, is a matter peculiarly within the trial court's discretion, and its ruling on that point will be disturbed only when there has been a manifest abuse of that discretion. In an unbroken line of precedents, this court has adhered to these principles and we find nothing in the record before us to establish that the trial court, in refusing to direct the production of the requested statements, abused its discretion. *State v. Payne*, 25 Wn.2d 407, 171 P.2d 227, 175 P.2d 494 (1946); *State v. Thompson*, 54 Wn.2d 100, 338 P.2d 319 (1959); *State v. Peele*, 67 Wn.2d 893, 410 P.2d 599 (1966); *State v. Boehme*, 71 Wn.2d 621, 430 P.2d 527 (1967); *State v. White*, 74 Wn.2d 386, 444 P.2d 661 (1968); *State v. Smith*, 74 Wn.2d 744, 446 P.2d 571 (1968).

Defendant, citing *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), next claims error in what he describes as a systematic exclusion of a substantial

portion of the community from the jury because, he asserts, the court declined to sit all prospective jurors and alternates who were opposed to the death penalty. Our search of the record and study of controlling authorities reveals no systematic exclusion of any class of people from the jury. There is nothing in the record or the briefs to substantiate this assignment of error, and we find it to be without merit.

■ Defendant assigns error to a denial of his motion for a mistrial made when the court informed prospective jurors that jurors in another homicide case had been kept together; that the instant case might last as long as 2 weeks; and that the jury would be kept together throughout the trial. He contends that this information encouraged some prospective jurors to offer excuses which they otherwise would not have asserted in order to avoid serving. No authority is cited for the proposition that conveying information of this kind or giving prospective jurors an estimate of the time they will be sequestered impairs the selection of an impartial jury or constitutes a systematic exclusion of a class of jurors from jury service. We do not believe it error for the court to give prospective jurors an estimate of the time the trial will take or to advise them that they will in all probability be kept together throughout the trial. Moreover, when asked if he had any objection to jurors who had sat on the other case being excused, defendant said he had none.

■ In his fourth assignment, defendant claims error when, at the commencement of trial and before a jury had been impaneled and sworn, the court denied his motion to dismiss count 7 charging murder in the first degree; in his fifth assignment, he urges error in the court's refusal to dismiss all other counts. He based these early motions on a claim that in the opinion of three psychiatrists the defendant at the time of the offenses charged was mentally incapable of forming a specific intent to commit them. These motions, we think, are untenable. Motions to dismiss, for want of what the accused described as specific intent, made even before a jury had been selected involved one of the

very issues which would necessarily be resolved in the trial of the case for each count charged a crime requiring intent. Whether there would be sufficient evidence to submit the issue of intent—or any other elemental issue—to the jury was a question of law for the court to resolve. *State v. Reynolds,* 51 Wn.2d 830, 322 P.2d 356 (1958). Before ruling on a motion to dismiss based on a failure to establish one of the elements of the crime charged, the court must apply the familiar test that the evidence and all reasonable inferences to be drawn from it will be considered in a light most strongly against the challenger and most favorably to the opposing party. *State v. Woody,* 73 Wn.2d 179, 437 P.2d 167 (1968); *State v. Holbrook,* 66 Wn.2d 278, 401 P.2d 971 (1965); *State v. Jesse,* 65 Wn.2d 510, 397 P.2d 1018 (1965). The court could not test the sufficiency of the evidence until it had heard it. Consequently, defendant's claim made before trial that he was unable to form an intent to commit the crimes charged was premature and properly denied. Other aspects of this assignment arising during trial and involving the question of criminal intent will be discussed in connection with assignments 7 and 8.

As set forth in the brief on appeal, assignment 6 claims error in the withdrawal of the question of mental irresponsibility from the jury; assignment 7 claims error in the ruling that psychiatrists would not be allowed to answer hypothetically the legal question of whether defendant could form a specific intent to commit the specific crime charged; and assignment 8 specifies error at the exclusion of psychiatric opinion evidence as to whether, at the time of the crimes, defendant was sane under the right-wrong test. Discussions of these assignments, closely related as they are in the record, will necessarily overlap and commingle.

The defendant, in accordance with RCW 10.76.020, entered a written plea of insanity and mental irresponsibility as of the time of the commission of the acts charged in the information, alleging in his plea that he had since become and at the time of arraignment was sane and mentally responsible. The court withdrew this issue from the jury to

which the defendant directs his sixth assignment of error. Whether there was competent evidence to support that issue involves to some degree defendant's mental state or condition induced by the voluntary ingestion of drugs and alcohol—a point which will be discussed later in connection with other assignments.

██ A plea of insanity or mental irresponsibility is an affirmative defense and places on the accused the burden of sustaining it by a preponderance of the evidence. *State v. Collins*, 50 Wn.2d 740, 314 P.2d 660 (1957); *State v. Putzell*, 40 Wn.2d 174, 242 P.2d 180 (1952); *State v. Mays*, 65 Wn.2d 58, 395 P.2d 758, *cert. denied*, 380 U.S. 953, 13 L. Ed. 2d 970, 85 S. Ct. 1086 (1964-65); *State v. Niblack*, 74 Wn.2d 200, 443 P.2d 809 (1968). If the record is devoid of substantial evidence in support of the plea of insanity or mental irresponsibility, it is error to submit that issue to the jury. *State v. Piche*, 71 Wn.2d 583, 430 P.2d 522, *cert. denied*, 390 U.S. 912, 19 L. Ed. 2d 882, 88 S. Ct. 838 (1967-68); *State v. Rio*, 38 Wn.2d 446, 230 P.2d 308 (1951). The insanity and mental irresponsibility contemplated by the statute authorizing this plea means an involuntary state and condition; the accused must show that the mental condition is involuntary and not self-induced, for the statute expressly excludes mental conditions produced by the voluntary acts of the defendant:

> Any person who shall have committed a crime while insane, or in a condition of mental irresponsibility, and in whom such insanity or mental irresponsibility continues to exist, shall be deemed criminally insane within the meaning of this chapter. *No condition of mind induced by the voluntary act of a person charged with a crime shall be deemed mental irresponsibility within the meaning of this chapter.*

(Italics ours.) RCW 10.76.010.

██ Under statutes which authorize a plea of insanity (RCW 10.76), insanity or mental irresponsibility are interchangeable terms synonymously employed in the criminal law (*State v. White*, 60 Wn.2d 551, 374 P.2d 942 (1962); *State v. Schneider*, 158 Wash. 504, 291 P. 1093, 72 A.L.R.

571 (1930)), to denominate a mental state or condition embodied in what has long been referred to as the M'Naghten Rule, first announced in 1843. *M'Naghten's Case,* 8 Eng. Rep. 718 (H.L., 1843). The inexorable processes of time have wrought changes in the language of the rule since its first announcement but left its original meaning essentially intact. The M'Naghten Rule in this state describes insanity or mental irresponsibility as a disease or mental condition affecting the mind to an extent that, at the time the crime is alleged to have been committed, the mind of the accused is so diseased or affected that he is unable to perceive the moral qualities of the act with which he is charged and is unable to tell right from wrong with reference to the particular act charged. *State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962); *State v. Carpenter,* 166 Wash. 478, 7 P.2d 573 (1932); *State v. Putzell, supra.* In order to warrant an acquittal on the basis of insanity or mental irresponsibility, the accused must establish his mental illness by a preponderance of the evidence; and under the statute which authorizes the accused to plead insanity, the condition of mind urged as a defense cannot be induced by his voluntary acts. RCW 10.76.010; *State v. Rio, supra; State v. Huey,* 14 Wn.2d 387, 128 P.2d 314 (1942).

In withdrawing the issue of insanity and mental irresponsibility raised by the defendant's written plea of insanity, the court looked to the record. Aside from the defendant's testimony that he had voluntarily taken narcotic and hallucinogenic drugs and other drugs and alcohol, there was no evidence showing he was mentally irresponsible or legally insane. His testimony concerning his mental condition during the time of the crimes charged, and as shown in the evidence, established no more than that he could not remember what he had said or done.

Defendant's testimony, standing alone, that he could not remember or recall any of the crucial events depicted in the evidence does not meet the tests of the M'Naghten Rule for two reasons: First, the loss of memory described by him was, according to his own testimony, attributable to

his voluntary taking of drugs and liquor during a period of time immediately prior to the events which were shown in the state's evidence as a basis for establishing the defendant's guilt. Second, he did not testify nor offer by competent evidence to prove that—except for the effects of drugs and alcohol—he was insane or mentally irresponsible at the time of the acts charged.

The defense of insanity or mental irresponsibility places upon the accused the responsibility of showing, *inter alia,* by a preponderance of the evidence that the mental condition interposed as a defense was not voluntarily induced nor produced by voluntary intoxication. Neither of the two psychiatrists called by the defendant to substantiate defendant's plea of insanity testified that they had examined him before or during a relevant period after his arrest to determine if he was insane and mentally irresponsible. Their opinions as to his mental condition at the time of the commission of the crimes charged were necessarily based on his own testimony as to drugs and alcohol taken by him during a period of time just prior to the interval of the acts charged. His proffered proof thus did not go beyond describing a condition induced by drugs and alcohol taken by him at his own volition and with knowledge of what he was doing. Defendant thus sought to assert as a defense a mental condition induced by his own voluntary actions—a condition of mind we find not relevant to his plea of insanity under the statute (RCW 10.76.010). The doctors did not offer to testify that, in their opinions, the defendant either at or before trial or during the times when the crimes charged were shown to have occurred, was suffering from such a disease of the mind as would render him mentally irresponsible or insane; and the defendant offered nothing to indicate that during any of the same intervals he was involuntarily insane or mentally irresponsible. *State v. Huey, supra; State v. Bower,* 73 Wn.2d 634, 440 P.2d 167 (1968).

There being no substantial evidence to sustain the issue of insanity or mental irresponsibility as pleaded under the

statute, it would have been error to submit that question to the jury, and the court properly withdrew it from their consideration. *State v. Piche, supra; State v. Rio, supra.*

But the record is replete with evidence that the defendant was, in contemplation of law, mentally responsible. Aside from the depravity and criminality of his actions as described by the witnesses, and in addition to the legal presumption of sanity, the jury had much before it upon which to hold the defendant criminally responsible. There was abundant testimony from the victims and the police to show that the accused at all times understood the nature and quality of his acts, carried them out with cool, if brutal, assurance and with an ostensible design and capacity to make good his escape from the law after committing them. The evidence depicting the circumstances surrounding the commission of each crime readily permitted the jury to find that at all relevant times defendant appreciated reality, knew where he was and wanted to go, comprehended his role in each crime, was aware of the surrounding circumstances, understood the legal consequences of his actions and sought to flee them. These concepts are inextricably germane to the question of criminal intent, next under consideration.

Because—apart from the court's withdrawal of the insanity issue—the defendant's remaining assignments of error relate to proof of his capacity to form an intent to commit the crimes charged and involve his ingestion of drugs and alcoholic liquor, his testimony will be summarized.

Tyler began his direct examination by stating that he understood the proceedings of the trial and had been advised by his attorney. He did not claim to be either incompetent or under a mental disability at trial. He said that he had been convicted in 1944 or 1945 of a crime and at the age of about 17 years had been sentenced to the California State Prison at San Quentin. Earlier, as a child of 5 or 6, he had been placed in the Washington Children's Home and later in the Luther Burbank School. He said that he had completed approximately 11 years of schooling and had never been treated for a mental disease or disorder.

He had been convicted of a felony in Washington, he said, sentenced and then paroled. He explained his presence in Seattle at the time of the offenses charged by stating that, while on parole in Wenatchee, he had been arrested for drunken driving; then 3 days later while on reinstated parole he became drunk again and, scared that his parole would be revoked, left Wenatchee and came to Seattle. In leaving Wenatchee, he said, he violated the conditions of his parole.

He said that because he violated his parole in coming to Seattle, he used the name Peterson thereafter instead of his true name. To establish this false identity, he bought some identification papers consisting of "Driver's license, things like that." Relating bits of his personal history, Tyler told the jury that he had run away from the Preston Reform School in California—having earlier been sent there for burglary of a dry cleaner's establishment. Later, while in San Quentin, he started using drugs for the first time— Benzedrine, inhalers and marijuana. Since his release from San Quentin, he testified he had taken many different drugs—"All kinds of amphetamines, methedrine. I have used morphine and Dilaudid, cocaine and heroin, not to excess." He had been convicted, he said, of burglarizing a laundry in Port Angeles, Washington, and later of grand larceny by check. At the time of the check offense, he said, he had been using what he referred to as "Speed," a drug whose composition he did not know but described as "just a stimulant," and was using amphetamines and methedrine, too, all of which he bought illegally when he would "run into somebody that had them." He said that, when last serving time in the "Washington State Institution," it was difficult to obtain drugs, and he seldom got them there.

Bringing his recollection down to about February 22nd —Washington's Birthday—just before the commission of the offenses charged, he described on direct examination his activities in and around Seattle. He said that he was in Seattle on February 21st and thought he was living at the Tropics Motel but was not sure whether it was the Tropics

or City Center Motel. Although not certain of it, he believed he went to the Space Needle Restaurant on the 20th, but on the 21st he said he arose

> I would say around 10:00 o'clock or 10:30. It was afternoon. The sun was out, and it had warmed up a little, and I went up to a couple friends' house, girl friends, and one of them had to go to an airport, had to go to the airport that day. Q. Of the 21st? A. Yes. Q. All right. A. And I and this one girl, Phyllis, we took a walk, just walked around town and had a few drinks. I think we went to, I couldn't say for sure, it was in the afternoon, the Grosvenor House, I think. I was going down to see about buying a car. She left me. It was around, I would say, about 2:30 or 2:00 o'clock, and I went down to see about buying a car.

The day before, on the 20th, he said he had been "taking amphetamines, pills and drinking," and that the amphetamines made him "high." He remembered promising a girl named Phyllis on the 21st that, when he bought a car that day, he would drive her to the airport to catch a 3 o'clock plane. The car he wanted to buy, he said, was not available but

> [T]he man that told me that he was going to let me use the car, works at the, I know it's one of the Rambler Companies, but I don't know which one. I cannot remember the first name. It was up around 13th, 12th or 13th. It might have been Midtown Rambler. I don't know for sure. But, I explained to him that I needed the car; that I had to take this girl to the airport, and it ended up that he drove me and her out there and then drove me back, and the car was back when we got back.

According to his testimony of his activities, he had been taking drugs before going to the Sea-Tac Airport and kept on taking them at irregular intervals thereafter. He did not know, he said, how much he had taken, but did know that he bought 30 pills at $1 each and that they were 10 grain pills of what is called "Christmas Trees," and he supposed the medical term for Christmas Trees was Dexedrine. He could not be sure how many Christmas Trees he ingested for he did not know how many of the pills he had left.

Then, after his return from the airport he said he started drinking pretty heavily.

About 7 o'clock the evening of February 21st, he said he went to the Kansas City Steak House and had a steak dinner, then drove around in the car. He then went to several nightclubs in the downtown area taking some drugs during the intervals. Using a needle, a syringe and eyedropper, he said he shot some "what they call, Blu-Morphan. I think it is a synthetic morphine." He could not specify the amount but guessed it to be "one and a half, two pills," but the quantity and time of taking were uncertain and only vaguely described by him because, as he then testified, he was not even certain that he took any of the drugs at all on the 21st of February. "I don't even recall. I cannot even say I shot anything on the 21st, because I don't know if I did or not  .  .  .  I possibly did, because I usually did, and it is just a matter of habit, I guess."

He did say that he had a car, had driven it back from the airport, and had parked it within walking distance of the Kansas City Steak House. He said he went to a dining room called the "El Gaucho" that night or the afternoon of the 21st. Professing uncertainty of memory, he repeated that he did not know if he shot "Blu-Morphan" on the evening of the 21st, but remembered he had been taking "Black Bombers" or "Black Panthers" that night, which he thought contained methedrine but did not know their strength or how many he had taken. He said he had been drinking alcoholic liquor, too, that night because the pills made him thirsty. After a recess in trial, he corrected his testimony to say that these events just described took place on the 20th of February instead of on the 21st as just related.

The defendant on direct testified that he spent quite a bit of time around the Kansas City Steak House and a place called the "Outer Limits Tavern" since being in Seattle. Having amended his testimony to relate the events just described to the date of February 20th, he proceeded on direct examination to testify as to the events on February 21st. He said he awoke around 9 or 10 o'clock after having

taken a couple of Nembutals to sleep on the night before. He described these as "Yellow Jackets."

He slept that night at the Tropics Motel. He was feeling groggy, he said, when he awoke so he took a couple of drinks of Vodka, and then, in the dining room of the Tropics Motel where he was staying, he took a couple of pills which he called "Black Bombers." He left the Tropics around 11 or 12 o'clock that day of the 21st to find the car he said he had parked downtown. As he remembered it, he found the car at First and Pike or Pine, went into Johnson's Tavern at First and Pike, and then to a friend's house where "we smoked a couple sticks of marijuana," around noon of the 21st. From there he walked to the Outer Limits, had a couple of drinks and sat around just talking. Around 6 o'clock that evening, he called the car lot where he had obtained the car, told the man who had turned it over to him that he would park it on the side street, and that he did so, and the man came out and got the keys to it. This accounted for his actions according to his version of the events until 7:30 or 8 o'clock the evening of the 21st.

Around 7:30 or 8 he guessed, he went to a nightclub called "The Fifth Amendment" where later on he took some narcotics he referred to as "Christmas Trees." He was feeling pretty good for a while after smoking the marijuana, so he did not take the Christmas Trees right away, but by the time he got to The Fifth Amendment he was ready to take some more Christmas Trees. Meanwhile, he said he was drinking vodka collinses but did not know how many of these he drank. He said he had a steak dinner at The Fifth Amendment and then he said later he went to Bob's Chili, a block away, and ate another steak, asserting that the marijuana must have given him an appetite. He said he left Bob's Chili at around 9 o'clock and went back to The Fifth Amendment where he took an LSD pill by trying to shoot it into his arm:

> I tried to shoot it, and I had never taken it before. I tried to shoot it, and it burnt, so I just ate it out of the spoon that I was cooking it in.

Tyler said he had no recollection of events thereafter until he remembered talking in the Seattle city jail to Mr. Mullen, a Seattle detective, and that he was in a padded cell when the officers came to get him. He said he could not remember his conversation with Detective Mullen, but then, recalling earlier events, said that when at Bob's Chili he "shot a cap of cocaine that a friend of mine gave me. He knew that I used Speed. He was pretty well loaded. He was just in a friendly mood, I guess." He testified that he had no recollection of being in the Pee Wee Tavern, of robbing Mr. Knapp or of robbing either of the taxicab drivers, and had no memory either, he said, of being at the Town House Apartments or ever seeing the witness Mary Robertson.

In deciding whether the defendant's testimony on direct examination laid a foundation for the admissibility of opinion evidence concerning his mental capability of forming an intent to commit the crimes charged, the record makes clear that these claimed conditions were induced by the voluntary consumption of drugs and alcohol. Nor is there escape from the marked vagueness and uncertainty concerning the quantities, strengths and kinds of drugs ingested by him and the indefiniteness as to the intervals in which he claimed to have taken them.

The defendant's testimony on cross-examination was similarly vague, indefinite and uncertain. He said he had been released on parole from the Washington State Penitentiary in November of 1967 and repeated that, when he came to Seattle from Wenatchee, he was in violation of his parole and that he used the name of Peterson to conceal his identity and had used this name when negotiating with the Midtown Rambler Automobile Agency. He said that before coming to Seattle he had worked as a carpenter in Wenatchee in November of 1967 but was vague as to his starting and terminating times, placing his commencement from the "10th or 11th, 12th, 13th or 14th" of November and ending "after New Years. I don't remember the exact day. Whether it was the first or second week of January that I came over here, I don't remember." He remembered that

he earned enough as a carpenter to "get 50 some dollars back in income tax" and also that he worked in the apple orchards for $2 an hour. When asked if these earnings, were the money he lived on when he came to Seattle, he answered, "No, I had other money." He said he had not worked since coming to Seattle.

He could not recall the last name or the address of the girl friend he drove to the airport on February 20th, and offered no corroboration whatever of this event. He could do no more than describe the approximate location of the apartment house where she lived. He said, on cross-examination, that they walked downtown around noon, went into a nightclub called the "Plaid Piper" and had a drink, that after they left that place she told him she had to go to Portland, and that he told her he was going to buy a car and would drive her to the airport. He arranged for the purchase of the car, he said, with a man named "Ted" at Midtown Rambler, left a $5 deposit and was told to return the car next day. He testified, "I signed the papers and everything. That was to use this car, to try it out . . . it was a red, a red two-door six." He called neither the girl friend nor the Rambler salesman as a witness and offered no explanation therefor, and presented no witnesses to substantiate his activities and demeanor during February 20th and 21st.

Throughout his cross-examination, his descriptions of the amounts, the kinds of drugs, narcotics and alcohol, their strengths, the intervals of taking, and his identification of them was indefinite, vague and doubtful. Asked if he had pills in his pocket when he went downtown on the 20th of February, he answered, "20. Yes," and when asked if they were Dexedrine or biphetamine, replied, "None of them . . . I think they were the amphetamine, Dexedrine, Christmas Trees, yes." He said sometimes he bought 20 and at other times 50 at a time. He could not remember how many pills he took while at the El Gaucho or at the Kansas City Steak House on the 20th, saying, "I cannot tell you any time how many I took here ·and there, or here and

there. I don't really know. I took them all day. I ate them like peanuts." He could not say how much liquor he drank on the night of the 20th before returning to his quarters at the Tropics Motel. He said on cross-examination that he went to bed that night of the 20th but awoke and took some Yellow Jackets to go to sleep on.

The vagueness and uncertainty of his testimony is illustrated in his testimony on cross-examination that he may or may not have eaten breakfast that morning, the 21st; that he had a couple of drinks of vodka; that he took three pills from which, as he said within one-half hour after taking them, "I was straightened out pretty good," and then walked to the area where he had parked the car.

After walking around the area where he had left the car parked, he found it but decided not to move it. Without specifying the time, he said that after locating the car he went to Johnson's Tavern and had some T-Bird flips—five or six—and left the tavern to get some drugs. He said that he "went up to the Outer Limits and got 30 Black Bombers and then came back to Johnson's [Tavern]." From there he walked "quite a while" to a friend's house and there smoked two marijuana cigarettes. His testimony concerning his activities from then on as to the time and amounts of drugs taken is even more vague and speculative. He recalled walking down First Avenue. He thought he made a couple of stops at taverns and took pills with drinks—three or four pills, he could not recall exactly—and ended up at Johnson's Tavern. His testimony relating to his return to Johnson's Tavern and the taking of drugs there is equally indefinite and vague:

Q. But at Johnson's, did you have a couple drinks there with pills? A. I don't remember really taking them or not. I might have. I might not. I don't know.

From Johnson's Tavern, he said he walked uptown to the Outer Limits or a steak house where he thought he bought some pills, but was not sure of this and when asked if he had taken any there said, "I probably did. I probably give some away," but when pressed further on cross-examina-

tion testified: "I said I might have stopped and taken three or four pills in a couple of taverns. I don't know." He could not fix the time of his return to the Outer Limits beyond saying, "I couldn't tell you. It was in the afternoon." He probably took some more pills, he said, because he "usually did." Again, he was vague and indefinite as to his consumption of drugs or alcohol. He said that he sat there and talked and drank T-Bird flips. He said he bought 15 more pills, but didn't think he was out of them. He thought he gave some of the pills away because he believed the pills make one generous and freehearted, but did not know how many he had given away.

It was close to evening, he said on cross-examination, when he left the Outer Limits—around 6 o'clock—because he thought it was just getting dark and he drove the car he had rented back to the place where he was to return it and from there walked to The Fifth Amendment Tavern and Cocktail Lounge—arriving there about 8 o'clock or possibly earlier, at 7 or 7:30. He said he had dinner at The Fifth Amendment because he thought the marijuana he had smoked had made him hungry. Marijuana, he said, gives one an appetite. He said he had some more drinks at The Fifth Amendment and took some more pills, adding "Like I said, I ate them like peanuts." His drug taking at The Fifth Amendment he described:

Q. Did you take any more pills? A. You keep asking that, and I told you I take them and don't know when I take them really. I might have my hand in my pocket and just flip one in my mouth and not even realize. Q. And these were the Black Bombers? A. Right. Q. You didn't have any Christmas Trees? A. I might have had some Christmas Trees. I really couldn't tell you for sure. Somebody might have given me some during the day, that I met, and I don't even remember getting them from him.

He said he ate another steak dinner around 9:30, and may or may not have had drinks with this meal and could not remember if he took any more pills after dinner. He probably did but may not have, testifying:

I cannot remember. I might have taken two or three pills, if I had them in my coat pocket. I probably did.

He professed to have no recollection of any events after that, testifying on cross-examination:

Q. What is the last thing you remember? A. Going back up to the Fifth Amendment and listening to the music, and that is when I remember taking an LSD pill, at least I think I did, because I didn't have it on me when they searched me. I think I lost it. I remember putting something in my mouth, and I think it was the LSD pill, because I had it in my mind in a sort of a trip. I was just on a trip, and the next thing I knew I threw it in my mouth. The reason I think it was the LSD pill is that it was purple or lavender color, and I had thought about shooting it. Q. I thought you indicated that you tried to shoot it. A. Tried and thought is the same thing. Remembering or thinking I tried to shoot the pill is the thing. Q. Do you remember which? A. I had a spoon.

He recalled that he took the LSD into the lavatory, attempting there to inject it into his veins with a needle and an eyedropper, and, failing this, swallowing the drug. The LSD, he said, he got from a friend at The Fifth Amendment. He said he had no idea how many drinks he had had that day.

Defendant specifies in the brief his 4th, 7th and 8th assignments of error as follows:

4. The Court erred when it refused the appellant's motion to dismiss Count 7, which charged the appellant with first degree murder, the ground for the motion being that the evidence negated appellant's ability to form the specific intent requisite to the crime.

. . .

7. The Court erred when it ruled that the psychiatrists, based upon hypothetical questions could not answer the legal question as to whether or not the appellant could form a specific intent to commit the specific crimes charged.

8. The Court erred when it refused to allow the psychiatrist to answer any question as to whether the appellant was sane under the right-wrong test.

Some aspects of these assignments have been discussed earlier in connection with the court's denial of the motion to dismiss for want of intent and the withdrawal of the insanity issue from the jury. The main point now under consideration concerns the accused's offer to prove by opinion evidence his inability to form a criminal intent to commit the crimes charged.

Tyler's testimony is the only evidence in the record supporting his defense that he could not form a criminal intent. Otherwise, the record is devoid of any proof that he consumed any drugs and liquor whatever within a relevant period preceding and during the commission of the acts charged in the information. The three assignments of error thus necessarily involve the defendant's own testimony as to the identity, strength, dosage and intervals of taking the drugs and alcohol he said he had consumed during the day preceding and the day of the commission of the crimes charged.

In summary, defendant in these assignments urges error because the court failed to find as a matter of law that the evidence "negated appellant's ability to form the specific intent requisite to the crime"; in sustaining objections to hypothetical testimony whether "appellant could form a specific intent to commit the specific crimes charged"; and in refusing to allow the "psychiatrist to answer any question as to whether the appellant was sane under the right-wrong test." Since these assignments coalesce to a large degree to evoke inseparably linked doctrines, we will discuss them together.

■■ Issues of fact, including that of intent, when supported by substantial evidence must be resolved by the jury and not the court. There was abundant evidence in this record to sustain a finding of criminal intent as to each crime charged and a conviction on each count. And there was virtually no dispute or conflict in the proof as to the defendant's complicity in each of the crimes. If the claims of error are meant to question the adequacy of the proof, they come within the rule that a challenge to the sufficiency of the evidence, including proof of the intent with

which an act is done, admits the truth and all inferences which can be drawn from the evidence and requires that all of the evidence be interpreted in a light most strongly against the challenger and most favorably to the opposing party. *State v. Woody,* 73 Wn.2d 179, 437 P.2d 167 (1968); *State v. Reynolds,* 51 Wn.2d 830, 322 P.2d 356 (1958).

Whether the accused committed the acts charged and his intentions in doing them, were issues of fact to be resolved by the jury. The intention with which an act is done, of course, may be inferred from the act and circumstances surrounding it. *State v. Shelton,* 71 Wn.2d 838, 431 P.2d 201 (1967); *State v. Willis,* 67 Wn.2d 681, 409 P.2d 669 (1966); *State v. Mitchell,* 65 Wn.2d 373, 397 P.2d 417 (1964). In its instruction, the court properly reduced each count to its component elements and told the jury that each element had to be established to the satisfaction of the jury beyond a reasonable doubt and that, if the jury entertained a reasonable doubt concerning any one of the elements, it would be its duty to return a verdict of not guilty as to that count. Then, on the matter of intent, the court charged in instruction No. 9:

> As used in the information in said cause and these instructions, "willfully, unlawfully and feloniously" means intentionally and purposely, but not accidentally, and without and beyond the authority of law.

The jury was thus charged as a whole that the state had to prove beyond a reasonable doubt that the defendant intentionally and purposely committed the crimes charged or else acquit him as to any count where they were not satisfied beyond a reasonable doubt of a criminal intent. Defendant took no exception to this instruction nor does he contend that it is erroneous or improper.

He did take exception to the court's failure to use the word *specific* as a modifier whenever the word *intent* was used in the instructions, but we think that this word would add little to the instruction, and its omission would not be reversible error. And as to the charge of murder in the first degree, count 7, the court, after defining its component

elements, instructed that the state had to prove each element beyond a reasonable doubt, explaining, however, that the crime could be committed either by shooting with a premeditated design to effect death or without such premeditation while in the commission, attempt to commit, or withdrawing from the scene of an attempted robbery. It defined and explained, too, what is meant by premeditation. The court instructed on murder in the second degree and manslaughter, and charged that, if the elements of either of these lesser crimes were proved beyond a reasonable doubt, the jury could and should return a verdict as to whichever of the lesser offenses it found proved.

Then, after instructing the jury that the issue of insanity and mental irresponsibility had been withdrawn from their consideration, the court fully instructed the jury, we think, on the extent to which the state of voluntary intoxication from alcohol or drugs could be considered as a defense:

Instruction No. 6 stated:

According to the statutes of the State of Washington, no act committed by a person while in a state of voluntary intoxication from alcohol or drugs shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of his intoxication may be taken into consideration in determining such purpose, motive or intent. If a person is intoxicated to such a degree that he is not capable of forming a specific intent to commit a crime, he cannot be guilty of any crime of which a specific intent is a necessary element.

This statute is not designed to give immunity to persons who commit crime when they are affected by intoxicating liquor or drugs. You must discriminate between the conditions of mind merely excited by intoxicants, and yet capable of forming a specific intent to commit a crime, and such a prostration of the faculties as renders a man incapable of forming the intent. If an intoxicated person has the capacity to form an intent to commit the crime charged and conceives and executes such an intent, it is no defense that he was induced to conceive it, or to conceive it more suddenly, by reason of his intoxication.

All in all, the court gave 36 instructions running to 40 pages of the statement of facts.

As earlier noted, the court did receive the defendant's detailed testimony concerning his taking drugs and liquor and their effect on him and his asserted loss of memory during the intervals of the crimes. And the court did admit extensive psychiatric testimony as to the effects these drugs and liquor generally produce. Objections were sustained, however, to the offer of the psychiatrist's opinion that the defendant, at the time of the commission of the offenses charged, was incapable of forming a criminal intent to commit the crimes charged in the information.

The evidence as to the defendant's voluntary consumption of drugs and liquor was received in accordance with RCW 9.01.114 to be considered by the jury in determining the intent, design and premeditation with which the acts charged were done,[1] for this statute expressly allows the jury to take such evidence into consideration in determining purpose, motive or intent. *See* instruction No. 6, *ante.* Insanity induced by voluntary intoxication is no defense to crimes involving intent and purpose. *State v. Beaman,* 143 Wash. 281, 255 P. 91 (1927); *State v. Huey,* 14 Wn.2d 387, 128 P.2d 314 (1942); *State v. Bower,* 73 Wn.2d 634, 440 P.2d 167 (1968). RCW 10.76.010, RCW 9.01.114.

Defendant now contends, however, that, in addition to the hypothetical opinion given as to the effects of certain drugs generally, the doctors should have been allowed to express their opinions that, from defendant's description of the drugs taken, he could not have formed an intent, or, as he puts it, a specific intent to commit the crimes charged.

His position on this point, we think, is unsound and unsupported by the authorities. To allow the doctors to express their hypothetical opinions as to the intent or lack

---

[1]"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of his intoxication may be taken into consideration in determining such purpose, motive or intent." RCW 9.01.114.

of it with which certain described acts were done, when the record does not contain reasonably definite and explicit facts upon which to base such opinions would effectually permit medical experts to usurp one of the vital functions of the jury. It would allow the doctors to convey their opinions as to ultimate facts in cases where the record does not contain sufficient facts upon which an opinion can reasonably be stated.

The two psychiatrists whose opinion testimony was offered had no reasonable medical knowledge of the quantities of cocaine, amphetamines, Dexamyl, marijuana and LSD or the strengths and dosages of any of them or the intervals in which they were taken upon which to form a reasonable medical opinion. They had not examined the accused during a relevant time before or after the occurrence of the acts charged. They had no facts before them upon which their opinions could with reasonable medical certainty be based. The doctors could and did, as earlier noted, express their general opinions as to the physical and mental effects of drugs and alcohol under the statute (RCW 9.01.114) which permits a jury to consider voluntary intoxication with respect to the matter of intent or purpose, but had no foundation in the evidence upon which to render with reasonable medical certainty an opinion as to his mental condition and state of mind during the time when the crimes were committed. These offered opinions were, therefore, properly excluded as being speculative, argumentative and the unsupported expression of opinion as to an ultimate fact in issue.

For example, Dr. Ogle, a psychiatrist, did testify extensively concerning the general effects of drugs upon a person. Objections were sustained, however, to questions intended to elicit his opinion as to the defendant's mental state immediately prior, during and following the commission of the acts charged, for the doctor had not examined the defendant within a relevant period of the acts charged and he did not know within reasonable latitude the kinds, amounts, dosages or intervals in which the drugs were claimed to have been consumed by the accused. The record,

consequently, supplied the doctor with no basis in fact upon which he could render his opinion with reasonable medical certainty as to the defendant's mental state. The speculative quality of his observations, although referring more particularly to the right and wrong test rather than the more precise issue of intent, may be seen in his testimony on cross-examination concerning the defendant:

Q. His inability to distinguish the moral qualities of the act and his inability to distinguish between right and wrong with respect thereto, is that based upon his consumption of these drugs? A. In the hypothetical case presented the disorganizing effect and the inability to distinguish what action was being done, and the matter of right and wrong in it, which might have been done, in effect, in my estimation would be related to the taking of the drugs. Q. And take away the drugs, the hypothetical man, I take it, would be able to appreciate the moral qualities of his act in the normal course of events and appreciate the difference between right and wrong with respect to his normal conduct? A. That is my belief. Q. And the same is true with respect to his ability, reality contact in the normal course of events, absent the drugs; is this person normally in contact with reality? A. It is my belief that this person would normally be in contact.

The doctor's opinions both as to the right or wrong test or the defendant's state of mind during the period of the crimes charged were therefore properly excluded.

Dr. Hurley, the other psychiatrist called by defendant, had not examined the defendant during a time relevant to the time of the crimes. He testified to the general effects of dextroamphetamines, biphetamines, methedrine, cocaine, LSD, and alcohol on the human system and personality. But the doctor could connect this evidence to the defendant no more specifically than to say that the reaction to combining dextroamphetamine, biphetamine, LSD and cocaine in one person at the same time would depend on the amount of a person's tolerance to it. Dr. Hurley testified: "In relatively small doses he might appear to be merely hyperactive, hyperalert, tense, jittery, or he could actually become psychotic," adding, "Well, if it hadn't been for the LSD, there might not have been any unusual effect, but the

LSD could have shattered his personality to the point where he was clinically insane."

On cross-examination, Dr. Hurley said that, if the defendant had taken the amounts of the various drugs he had said he had taken, it might well have been a fatal dosage. Dr. Hurley stated that even a large amount of amphetamine does not take away the capacity to know what one is doing, that patients who have taken even large amounts know they are sick and voluntarily seek out a doctor. The drugs, he said, do remove normal caution, but one genuinely under the influence of narcotics would not ordinarily try to conceal a crime, or require a cab driver he was going to rob to pull into a garage, or remove a billfold because it has fingerprints on it. The doctor could not and did not say that the defendant was insane at the time of the acts charged. His opinions as to the defendant's intentions or state of mind in committing the acts charged were entirely speculative and conjectural and could not be stated with reasonable medical certainty. Objections to them were properly sustained.

Ordinarily a witness must testify as to facts within his personal knowledge and cannot express his opinions. Experts in a given science, art, profession, skill or calling, however, may state their opinions on subjects in which they have acquired special knowledge or proficiency and which opinions are based on facts established with reasonable certainty in the record. Hypothetical questions must, therefore, rest on facts in the record; they cannot be founded on speculation and mere conjecture. 31 Am. Jur. 2d *Expert and Opinion Evidence* § 56 (1967). Here the defendant's testimony concerning the kinds, quantities, strengths and intervals of taking the drugs and alcohol was so vague, indefinite and uncertain that no competent medical opinion could be legally expressed as to the effect they had on him at a given time and place; nor could it be stated with reasonable medical certainty whether the accused was incapable of forming an intent to commit the crimes whereof he stood charged at the time of their commission. *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 381 P.2d 605

(1963). Since the doctors had not examined the defendant within a relevant period of time and were not at the scene of any of the crimes, they had no testimonial knowledge of his mental state or condition at the times when the crimes were committed. Their opinions thus came within the rule of *State v. Farley*, 48 Wn.2d 11, 290 P.2d 987, *cert. denied*, 352 U.S. 858, 1 L. Ed. 2d 65, 77 S. Ct. 79 (1955-56), where, as here, the defendant sought to rebut the inference of premeditation and intent by having a doctor testify hypothetically as to the accused's mental reaction at the time of the commission of the crime. This court, denying the accused's contention, said, at page 20:

> Since the doctor was not present at the murder, he had no testimonial knowledge of appellant's appearance, statements, acts, and demeanor, or the circumstances surrounding the crime. His diagnosis of appellant's state of mental health, as revealed by subsequent examinations, cannot be related to the particular instant of the crime.
>
> . . .
>
> "The intent with which an act is done is a mental process, and as such generally remains hidden within the mind where it is conceived, and is rarely, if ever, susceptible of proof by direct evidence, but may be inferred or gathered from the outward manifestations, by the words or acts of the person entertaining it, and the facts or circumstances surrounding or attendant upon the offense with which he is charged."

Of similar import on this point are our decisions in *State v. Moore*, 61 Wn.2d 165, 377 P.2d 456 (1963), and *State v. Cogswell*, 54 Wn.2d 240, 339 P.2d 465 (1959).

The doctors' answers to the hypothetical question as to the defendant's state of mind would have amounted to no more than conjecture and speculation, and the court properly excluded the psychiatrist's hypothetical opinion as to whether the defendant could form an intent to commit the crimes charged.

Finally, insofar as it may be contended that the element of intent is connected with the issue of premeditation in count 7, the first-degree murder charge, it should be noted that the defendant was charged in the alternative. The

information alleged and there was evidence to support both a premeditated design to effect the death of Ada White, or without design to effect her death, killing her while in the commission of, attempt to commit, or withdrawing from the scene of an attempted robbery. The jury was, we think, properly instructed on this subject. Thus, substantial proof either that the defendant with premeditation killed Ada White, or killed her while intentionally engaged in or withdrawing from the scene of an intentional robbery would be sufficient to warrant a conviction.

> The killing of a human being . . . is murder in the first degree when committed either—
>
> . . .
>
> (3) Without design to effect death, by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of, a robbery . . .

RCW 9.48.030(3). *State v. Self*, 59 Wn.2d 62, 366 P.2d 193 (1961); *State v. Burnett*, 37 Wn.2d 619, 225 P.2d 416 (1950); *State v. Miller*, 164 Wash. 441, 2 P.2d 738 (1931). The record contains ample evidence to sustain the verdict on both theories of murder in the first degree.

Accordingly, the judgment is affirmed.

FINLEY, WEAVER, HAMILTON, and McGOVERN, JJ., concur.

ROSELLINI, J. (dissenting)—I agree with the court's disposition of all of the questions presented on this appeal, save one. That is the question whether the trial court erred in refusing to admit the opinion of a psychiatrist concerning the appellant's ability to form the specific intent to commit the crimes charged. The offered opinion was based on the appellant's testimony describing the amount and kinds of drugs and alcohol which he recalled having consumed on the day of the crimes.

The majority says that the appellant's testimony about his activities on the day in question was so vague that no valid opinion could be based upon it. The trial court did not find it that insubstantial. It allowed the witness to give his opinion at some length but would not let him give an opinion on what it termed the "ultimate issue."

It seems to me that the appellant's testimony could be hardly precise and cogent if he did in fact consume a large quantity of stimulants, depressants, and disorienting drugs. But it was the jury's function to weigh this testimony. It is not a proper function of this court. The trial court did not exclude the doctor's opinion because it was based on vague testimony. Its refusal was based solely on its conclusion that such an opinion would be an opinion on the "ultimate question" to be decided by the jury. The trial court thought that an expert opinion on the "ultimate issue" is inadmissible as a matter of law.

It is clear that the trial court was in error in this. An expert may testify about the mental condition of a defendant at the time of the commission of an alleged crime. *State v. Bridgham,* 51 Wash. 18, 97 P. 1096 (1908); *and see State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962), at 575-581.

We held in *State v. Alden,* 73 Wn.2d 360, 438 P.2d 620 (1968), that the opinion of a qualified expert, if it will aid the jury in reaching its verdict and will not mislead it to the prejudice of the objecting party, is proper evidence even though it may be an opinion on the "ultimate issue."

The respondent and the majority tacitly recognize the validity of this principle, since they do not offer to support the trial court's ruling on the ground which the court itself gave for making that ruling.

The case cited by the majority, *State v. Farley,* 48 Wn.2d 11, 290 P.2d 987, *cert. denied,* 352 U.S. 858, 1 L. Ed. 2d 65, 77 S. Ct. 79 (1955), is obviously not in point. There the medical expert was asked to give an opinion regarding the defendant's mental state at the time of the alleged crime. The opinion would have been based solely on the doctor's subsequent examination of the defendant. The case does not hold that a psychiatrist cannot give an opinion concerning the mental condition of a defendant at the time of an alleged crime, based upon the testimony of the defendant concerning his acts and other conditions which may have affected his mental state. An expert opinion based on the testimony of a witness is admissible. *State v. McKeown,* 172 Wash. 563, 20 P.2d 1114 (1933).

This is a capital case and the presumption should not be indulged that any error which occurred was harmless error. I am dismayed by implications in the majority opinion that, if this court is convinced by the state's evidence, it will hold the erroneous exclusion of the appellant's offered evidence to be harmless and nonprejudicial. It is not this court which must be convinced of the appellant's guilt. It is the jury. And the appellant was entitled to have the jury consider any relevant, competent, and material evidence which he offered in his defense, if that evidence was not otherwise inadmissible by reason of some affirmative rule of law.

Here the rule is, as the majority concedes, that intoxication or mental derangement, even though self-induced, is a defense if it renders the defendant incapable of forming the specific intent which the state must prove in order to warrant a conviction.

The appellant offered medical evidence in the form of a psychiatrist's opinion that, if he had ingested all of the substances which he claimed to have consumed on the day of the crimes, he would have been incapable of forming such an intent. That opinion should have been received in evidence, the court having found the doctor qualified to give opinions based on the appellant's testimony, however vague that testimony may have been.

If the appellant's testimony concerning his activities was improbable, the jury could be expected to reject it, and with it, the psychiatrist's opinion based upon it. But it is not for this court to reject it or to say that the state's case was proved beyond a reasonable doubt. It is difficult to imagine that the jury would have found the appellant incapable of forming the intent necessary to commit the crimes which the evidence tends to show he did commit, and I strongly suspect that, if asked the question on cross-examination, the doctor would have testified that if the appellant had been sufficiently drugged to lose the ability to form an intent, he would have been unable also to coordinate sufficiently to do the acts involved in the crimes. However, there is no testimony to this effect in the record. One can only speculate as to how well the opinion would

have been tested and how well it would have stood up at the trial. It cannot be said, on the record before us, that the error in rejecting the official evidence was harmless. The appellant was entitled to have the jury consider such evidence as he was able to muster in his own defense.

In my opinion, the refusing of this evidence was prejudicial error and a new trial should be granted.

HUNTER, C. J., and NEILL, J., concur with ROSELLINI, J.

May 27, 1970. Petition for rehearing denied.